[No. B194082. Second Dist., Div. One. May 28, 2008.]

CARLOS ARTEAGA, Plaintiff and Appellant, v.
BRINK'S, INCORPORATED, Defendant and Respondent.

COUNSEL

Mancini & Associates, Marcus A. Mancini, Christopher Barnes; Benedon & Serlin, Douglas G. Benedon and Kelly R. Horwitz for Plaintiff and Appellant.

Crowell & Moring, James E. Kellett and Steven P. Rice for Defendant and Respondent.

OPINION

**MALLANO, Acting P. J.**—An employee at an armored transportation company was the subject of an internal investigation into missing cash and knew he could be terminated depending on the outcome. During the investigation, he notified his employer for the first time that he was suffering from pain and numbness in his arms, fingers, shoulders, and feet; he stated he had been experiencing those symptoms for a year or two; he expressed his belief that they were work related; and he filed claims for workers' compensation. Days later, he was terminated based on the results of the investigation.

The employee then filed this suit, alleging a claim under the California Fair Employment and Housing Act (FEHA or Act) (Gov. Code, § 12900 et seq.) for physical disability discrimination. He also alleged a claim for wrongful termination of employment in violation of public policy, contending he had been terminated in retaliation for filing workers' compensation claims. (See Lab. Code, § 132a.) The trial court granted summary judgment for the employer.

■ We conclude that the disability discrimination claim fails because the employee's symptoms did not constitute a "physical disability" under the FEHA. Specifically, the employee's pain and numbness did not make it difficult for him to achieve the life activity of working. The employer also had a legitimate, nondiscriminatory reason for the termination—loss of confidence in the employee—as confirmed by the investigation. Similarly, the wrongful termination claim, alleging retaliation, fails because the employer's lack of confidence in the employee constituted a legitimate, nonretaliatory reason for the termination.

For his part, the employee points out that he was terminated within days of disclosing his symptoms and filing his workers' compensation claims, emphasizing the close timing of the events. Although temporal proximity, by itself, may be sufficient to establish a prima facie case of discrimination or retaliation, it does not create a triable fact as to pretext once the employer has offered evidence of a legitimate, nonprohibited reason for its action. This is

especially so where the employer raised questions about the employee's performance *before* he engaged in protected activity, and the subsequent discharge was based on those performance issues. Accordingly, we affirm.

# I

## BACKGROUND

We accept as true the following facts and reasonable inferences supported by the parties' undisputed evidence on the motion for summary judgment. (See *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1125 [35 Cal.Rptr.3d 397].)

Since 1859, defendant Brink's, Incorporated, has provided secure transportation of customers' valuables, primarily money. Brink's uses armored vehicles, some weighing as much as 13 tons, staffed by three armed, uniformed employees: a driver, a guard, and a messenger.

The driver is responsible for following a predetermined route, which can be varied in a limited manner by the messenger during the run. The driver is stationed in a separate compartment from the messenger and the guard to ensure the safety of the public and the vehicle.

The guard, under the direction and control of the messenger, assists the messenger in carrying items to and from customer locations. The guard also protects against the "accidental mishandling" of valuables, which may result in a loss while "on the street." Brink's operations involve the threat of armed attacks on the crew.

The messenger has the most critical job. He exercises immediate supervision over the vehicle and its crew. The messenger "is responsible for making the actual delivery and pickup at customer locations, maintaining control of all shipments, and issuing and receiving a proper receipt at the delivery or pickup point." He accounts for and controls all valuables placed on the armored vehicle, including significant amounts of money on a daily basis. On "ATM runs," the messenger is responsible for removing "old money" from the ATM (residual cash), replenishing the machine with "new money," and removing deposits. He is responsible for returning residual cash and deposits to the Brink's vault.

Brink's personnel handbook states that the messenger is in charge of the crew and that his "primary duty . . . is to . . . employ the facilities provided for the safekeeping and security of shipments."

In August 1999, Brink's hired plaintiff, Carlos Arteaga, as an armored vehicle driver at its Los Angeles branch. Later, he became a guard and eventually a messenger. Thereafter, he spent most of his time as a messenger.

In his first two years, Arteaga was "written up" for missing a training class and being involved in two driving accidents. He was informed in writing that the failure to adhere to the requirements of his position would subject him to discipline, up to and including termination.

In early 2003, Arteaga was questioned about a $12,000 shortage that occurred on a run while he was acting as a trainer for a new employee. Raul Ruiz, the manager of Brink's Los Angeles branch, questioned Arteaga repeatedly about the missing money. After two months, Arteaga was told to forget about it.

In August 2003, Arteaga had a medical examination to maintain his driver certification for Brink's. The examination report showed that he was in good health. Arteaga completed part of the report, indicating he did not have any of several listed illnesses or health problems. In particular, he checked the "no" box beside (1) "[a]ny illness or injury in last 5 years"; (2) "[m]issing or impaired hand, arm, foot, leg, finger, toe"; and (3) "muscular disease."

In November 2003, Arteaga was suspended for one day without pay because he failed to deliver a $20,000 shipment to a bank and instead left it in the armored vehicle overnight. By written memo dated November 19, 2003, Brink's reminded Arteaga that he was responsible for the shipments assigned to him. The memo concluded: "Any further violations of Brink's policies, procedures or infractions of Brink's standards will result in further disciplinary action, up to and including termination of your employment."

The amount of money that Brink's collects from ATM's does not always match the bank's records as to what should have been collected. Brink's does not learn immediately about bank deposit shortages or overages—both of which are called variances—because it takes time for individual bank customers to receive notice of their deposits and to notify the bank of an error. A variance may involve, for example, a "missing deposit." The bank must first investigate whether the error occurred through an ATM to determine whether it should be referred to Brink's for investigation. This process can sometimes take months.

On March 1, 2004, a shortage of $4,540 was discovered in the cash that Arteaga had removed from an ATM in his capacity as a messenger. Ruiz looked into the matter. He learned that in July and August 2003, there had been eight shortages, totaling nearly $6,500, on runs where Arteaga had been

the guard or messenger. All of the shortages were due to missing deposits. Ruiz became suspicious of Arteaga.

Ruiz also reviewed a "variance tracking" report covering October and November 2003. Eight more shortages, totaling approximately $6,800, appeared on runs where Arteaga had been the messenger. According to Ruiz, "I took a look at the report. I started to sort of dissect it, come up with a common denominator, and . . . Mr. Arteaga's name was associated with numerous shortages . . . . Different guards, different drivers, and as the crew mixed, Arteaga continually was somebody that was on [the] route with the shortage or variance." After reviewing the report, Ruiz began a more formal investigation into the March 1, 2004 shortage.

The investigation included going to the ATM from which the funds were missing, counting deposits, verifying the sequence numbers of missing deposits, and talking to the crew. Ruiz also spoke to Arteaga, letting him know that there was an ongoing investigation into the March 1, 2004 variance. Arteaga could not explain the incident. Ultimately, the investigation did not determine the cause of the shortage, although it was learned that the ATM in question had "numerous problems" requiring that the machine be serviced.

On March 17, 2004, during the investigation, Arteaga informed Brink's for the first time that he was feeling a combination of "pain" and "numbness" in his arms, fingers, shoulders, and feet. He also disclosed for the first time that he was undergoing "a lot of stress." Arteaga completed a "Personal Injury—Employee Statement Form," indicating that "[i]n the year 2003, I was doing [a particular run] every single day. I was lifting at least one hundred boxes of coins on a light day with different weight each day. I started to feel some kind of pain in my arms and fingers, when waking up. I can't move and bend my fingers." Arteaga explained, "I never reported [this] because I thought the pain [was] going away but it didn't. Today, in the morning, 3/17/04, I was unloading coins and . . . I started to feel the pain in my arms and fingers again." Arteaga never exhibited any signs of his "medical problems" at work. Nor did his supervisors ever see him "suffering from any medical condition."

At his deposition, Arteaga said he began experiencing these symptoms "[p]robably a year before, two years before" he reported them. He did not report them at first because Brink's had a policy of terminating employees for work-related injuries if it was determined that the employee was at fault. But Arteaga concluded that the policy did not apply to him because he was not to blame for his injuries. He testified he had no reason to be concerned about being discharged because of them.

On March 17, 2004, the day he reported his symptoms, Arteaga was examined by a physician. One of Arteaga's supervisors, Alfred Zabala, accompanied him to the doctor's office. The physician determined that Arteaga was "okay" and sent him back to work with a full release. The physician completed a workers' compensation form to that effect. Zabala informed Ruiz of the situation and gave him a copy of Arteaga's personal injury form.

The following day, March 18, 2004, Arteaga asked Ruiz to demote him to a guard position so he would no longer be responsible for any missing deposits. Ruiz denied the request. Later that day, Arteaga completed another "Personal Injury—Employee Statement Form," complaining about "stress." He wrote: "Since early 2003, I have been accused over and over of stealing money. I have asked to be demoted to a guard position in the hopes that the blame would be lifted from me. I was denied this change. Yet you still have no trust in me. This is very confusing. Your words and actions have had some serious [e]ffects on my general health and emotional state of mind. I now get seriously sick just thinking about Brink's and going to work. My home life has been affected as well. I find myself yelling at my wife and kids over something that was said or done to me at work. The job itself is stressful enough without constantly being accused of wrongdoing. Either trust me or don't trust me. But stop going back and forth!"

On the same day, Arteaga handwrote a letter to "Raul Ruiz/Brink's Management," repeating verbatim the contents of the "Personal Injury—Employee Statement Form" submitted that day.

On March 22, 2004, Arteaga told Zabala that he was suffering from a rash on his face and body and that he believed the rash was job related. Arteaga asked to leave work to see a physician. Zabala replied, "I can't let you go." At his deposition, Arteaga referred to the rash as an "allergy" and admitted he had previously broken out with the same type of rash after getting mad at his wife.

On March 23, 2004, Arteaga approached Zabala, complaining about the rash again. Zabala told Ruiz about Arteaga's rash and that they were going to the doctor's office. There, the physician detected a "barely seen redness" on a small part of Arteaga's face and elbow. He determined the "rash" to be nonindustrial. The physician indicated that Arteaga could return to work without any restrictions and completed a workers' compensation form to that effect.

When they got back to work, Zabala told Arteaga that Ruiz wanted to see him. Arteaga went to Ruiz's office. Ruiz said he did not trust Arteaga anymore and handed him a letter dated that day, March 23, 2004. The letter stated:

"After several weeks of research and investigation, it has been determined that since October 2003, there have been several shortages totaling $7,668.00 from ATM Machines that you serviced as a Messenger. In each case it was determined that you were the only person to service the ATM Machine. While no one is accusing anyone of theft, the money was assigned to you and therefore your responsibility.

"The Handbook for Brink's Personnel, Section 9.020, Custody of Shipments, states: 'The primary duty of the messenger is to call and receipt for all shipments assigned to the run and to employ the facilities provided for the safekeeping and security of shipments. The messenger will not relinquish control over a shipment until proper receipt is received.'

"On the basis of your overall performance while employed by Brink's, the management of Brink's has lost confidence in your ability to perform your duties at the standard required of a Brink's Business Partner. As a result of this loss of confidence the decision has been made to terminate you[r] employment effective immediately. [¶] . . . [¶]

"Should you have any question after the date of termination you may contact me at the branch."

The decision to terminate Arteaga had been made the day before, March 22, 2004. Ruiz discussed the matter then with Richard Morris, Brink's employee relations director for the Pacific region. Ruiz recommended that Arteaga be terminated and Morris agreed. Morris drafted the termination letter and sent it to Ruiz on March 23, 2004. From March 17, 2004—when Arteaga first mentioned his symptoms—to March 23, 2004—the day of his termination, Arteaga did not display any difficulty in performing his duties.

During Ruiz's tenure as branch manager, there were 40 employees at Brink's Los Angeles branch—excluding Arteaga—who filed workers' compensation claims. Of the 40, one employee filed five claims; two filed three claims each; and eight filed two claims each. None of those employees was terminated. They either resigned or were still employed when Arteaga was discharged.

After leaving Brink's, Arteaga worked as an apartment manager from May to September 2004. Next, he performed security services at a restaurant. In

January 2005, he started working at Sectran Security Inc., a company similar to Brink's. His duties were virtually identical at Sectran; he worked as the messenger on an armored vehicle, loading and unloading shipments. Depending on the route, Arteaga made up to 57 stops a day. Arteaga did not, however, work with ATM's. There was only a two-member crew: the driver and the messenger. And although Arteaga was still handling money, there were fewer coins and more paper—checks and bills. Arteaga performed well at Sectran and without difficulty.

At some point after his termination and before August 10, 2005, Arteaga was diagnosed with carpal tunnel syndrome. This condition limited him in only one respect: He could no longer play soccer. He still suffered from pain in his arms and shoulders as well as numbness in his fingers and arms. He received chiropractic treatment.

On December 10, 2004, Arteaga filed this action against Brink's, Ruiz, and another supervisor. The complaint consisted of two causes of action. The first, under the FEHA, alleged that Arteaga suffered physical disabilities in his hands, wrists, elbows, neck, and shoulders, all of which he had reported to Brink's on March 17, 2004. Thereafter, Brink's purportedly engaged in acts of discrimination, harassment, and retaliation by (1) failing to determine how to accommodate him, (2) failing to engage in a good faith interactive process to determine effective reasonable accommodations, (3) failing to move him into another position, and (4) terminating him. The second cause of action, for wrongful termination in violation of public policy, alleged the same disability discrimination theory as the first cause of action, plus retaliation for filing workers' compensation claims—a right protected by Labor Code section 132a. Arteaga did not claim discrimination based on mental disability.

On January 5, 2005, Arteaga filed a first amended complaint (complaint) that was materially similar to the first one. Brink's and the individual defendants (collectively Brink's) filed answers, generally denying the allegations of the complaint. (See Code Civ. Proc., § 431.30, subd. (d).)

On December 9, 2005, Brink's filed a motion for summary judgment or, in the alternative, summary adjudication as to each cause of action. Brink's argued that (1) Arteaga was not physically disabled and could not establish a prima facie case of disability discrimination; (2) Brink's had a legitimate, nondiscriminatory and nonretaliatory reason for discharging him; and (3) the individual defendants could not be held liable under the FEHA or on a claim for wrongful termination of employment in violation of public policy. Arteaga filed opposition.

The trial court granted the summary judgment motion. Judgment was entered accordingly. Arteaga appealed.

## II

## DISCUSSION

On appeal, Arteaga argues that the trial court erred in summarily adjudicating the first cause of action, alleging physical disability discrimination under the FEHA, and the second cause of action, alleging wrongful termination based on a physical disability as well as retaliation for filing workers' compensation claims. Arteaga does not challenge the dismissal of the individual defendants.

We conclude that the FEHA claim and the wrongful termination claim alleging disability discrimination fail as a matter of law for two reasons. First, Arteaga was not disabled given that his symptoms did not make it difficult for him to achieve the life activity of working. Second, Brink's terminated Arteaga's employment for a legitimate, nondiscriminatory reason: Management lost confidence in him. The closeness in time between Arteaga's disclosure of his symptoms and his subsequent termination does not create a triable issue as to pretext, especially because his performance had been questioned before he disclosed his symptoms, and he was eventually terminated for those performance issues.

To the extent that the wrongful termination claim alleged retaliation for filing workers' compensation claims, it, too, fails because of the same legitimate reason for the discharge. Although Arteaga was terminated within days of filing his workers' compensation claims, such that the close proximity in time supports a prima facie case of retaliation, temporal proximity alone is not sufficient to create a triable issue as to pretext, particularly in light of Brink's statistical showing that the company does not discharge employees for filing workers' compensation claims.

### A. Standard of Review

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown

by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence.' " (*Raghavan v. Boeing Co., supra,* 133 Cal.App.4th at p. 1132.)

## B. *Physical Disability Discrimination Under the FEHA*

As stated in the FEHA: "The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." (Gov. Code, § 12926.1, subd. (b); all further section references are to the Government Code unless otherwise indicated.) "The provisions of [the FEHA] shall be construed liberally for the accomplishment of [its] purposes . . . ." (§ 12993, subd. (a).)

■ "Under a disparate treatment theory [as opposed to a disparate impact approach], discrimination occurs 'when the employer "treats some people less favorably than others because of their [disability or other statutorily prohibited characteristic or trait]." . . .' . . . '[T]he plaintiff must prove the ultimate fact that the defendant engaged in intentional discrimination. . . . An employer will be liable for intentional discrimination if it is shown that its employment decision was premised upon an illegitimate criterion.' . . .

"Federal and California courts have acknowledged the difficulty of proving intentional discrimination: 'Proving intentional discrimination can be difficult because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." . . . It is rare for a plaintiff to be able to produce direct evidence or "smoking gun" evidence of discrimination. . . .' . . .

■ " 'Consequently, the United States Supreme Court has developed rules regarding the allocation of burdens and the order in which proof is presented to resolve "the elusive factual question of intentional discrimination." (*Texas Dept. of Community Affairs* v. *Burdine* [(1981)] 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 216, 101 S.Ct. 1089, 1094]; see also [*McDonnell Douglas Corp. v. Green* (1973)] 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817].) . . . [P]laintiffs may demonstrate via indirect or circumstantial evidence that they were the victims of discrimination.' . . . 'First, it is the plaintiff's burden to prove by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff proves the prima facie case, then the burden shifts to the defendant to [articulate a]

legitimate nondiscriminatory reason for its employment decision. Third, if the defendant [offers such a reason], then the plaintiff must have an opportunity to show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. . . .' . . .

■ "While the burden of production shifts to the defendant under the *McDonnell Douglas* framework once a prima facie case is made, 'the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination remains at all times with the plaintiff.' . . . If the defendant succeeds in carrying its burden of production, 'the *McDonnell Douglas* [presumption of discrimination] "drops from the case" and the trier of fact determines the ultimate question of whether the plaintiff has shown intentional discrimination.' . . . [¶] . . . [¶]

"The burden of persuasion remains with the plaintiff even in the face of evidence that the employer's proffered reasons are pretextual: 'The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the *plaintiff's* proffered reason . . . is correct." . . . In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." . . .' . . . Nevertheless, evidence that the employer's proffered reasons are pretextual is significant: 'Thus, a plaintiff's *prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false,* may permit the trier of fact to conclude that the employer unlawfully discriminated.' " (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 822–824 [57 Cal.Rptr.3d 430], citations omitted, italics added; accord, *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–356 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1116–1118 & fn. 5 [94 Cal.Rptr.2d 579].)

■ " 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." . . .' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [67 Cal.Rptr.2d 483].)

■ "[W]e must keep in mind that the *McDonnell Douglas* test was originally developed for use at trial [(see *Guz v. Bechtel National, Inc., supra,*

24 Cal.4th at pp. 354–355)], not in summary judgment proceedings. 'In such pretrial [motion] proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying *McDonnell Douglas's* shifting burdens of production in the context of a motion for summary judgment, "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." ' . . . Thus, ' "[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. . . . In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. . . ." ' " (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150–151 [65 Cal.Rptr.2d 112], citation omitted.)

■ The FEHA does "not guarantee employees 'a stress-free working environment.' " (*Wehunt v. R.W. Page Corp.* (M.D.Ga. 2004) 352 F.Supp.2d 1342, 1354.) "[The Act] does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. '[The FEHA] addresses discrimination.' . . . '[It] is not a shield against harsh treatment at the workplace.' . . . Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. . . . 'While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is . . . whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve.' " (*Nix v. WLCY Radio/Rahall Communications* (11th Cir. 1984) 738 F.2d 1181, 1187, citations & italics omitted; see *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 358; *Adamson v. Multi Community Diversified Services* (10th Cir. 2008) 514 F.3d 1136, 1153; *McCollum v. Bolger* (11th Cir. 1986) 794 F.2d 602, 610.)

### 1. *Prima Facie Case of Disability Discrimination*

■ "A prima facie case for discrimination 'on grounds of physical disability under the FEHA requires plaintiff to show: (1) he suffers from a disability; (2) he is otherwise qualified to do his job; and, (3) he was

subjected to adverse employment action because of his disability.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886 [58 Cal.Rptr.3d 729].) We turn to the first prong of the prima facie case: whether Arteaga suffered from a disability.

Under the FEHA, "physical disability" includes having a physiological disease, disorder, or condition that, by affecting the neurological or musculoskeletal body systems, special sense organs or skin, "limits" a "major life activity." (§ 12926, subd. (k)(1)(A), (B).) "Limits" is synonymous with making the achievement of a major life activity "difficult." (*Id.*, subd. (k)(1)(B)(ii).) "Major life activity" is construed broadly and includes physical, mental, and social activities, and working. (*Id.*, subd. (k)(1)(B)(iii).) " '[W]orking' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." (§ 12926.1, subd. (c).) Whether a major life activity is limited "shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity." (§ 12926, subd. (k)(1)(B)(i).)

An actual or existing disability is not necessary. The FEHA defines "disability" to include (1) "[h]aving a record or history of a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment [that constitutes a physical disability], which is known to the employer"; (2) "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult"; or (3) "[b]eing regarded or treated by the employer . . . as having, or having had, a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment that has no present disabling effect but may become a physical disability." (§ 12926, subd. (k)(3)–(5).)

In a Ninth Circuit case holding that persons with monocular vision were disabled with respect to the major life activity of seeing, the court explained: " '[T]he FEHA does not require that the disability result in utter inability or even substantial limitation on the individual's ability to perform major life activities. A limitation is sufficient.' *DFEH v. Cal. Dep't of Corr.*, Dec. No. 03-11, 2003 WL 22733898, at *8 (Cal.F.E.H.C.2003). [¶] . . . [¶]

"In deciding whether [the employees'] limitations . . . make them 'disabled' under FEHA, the proper comparative baseline is either the individual without the impairment in question or the average *unimpaired* person. For example, several [Fair Employment and Housing Commission (FEHC)] decisions rely on medical evidence that demonstrates a limitation relative to the individual's own unimpaired state. *See, e.g., Cal. Dep't of Corr.*, 2003

WL 22733898, at \*8 (noting, among other things, a '25 percent reduction of [the complainant's] former capacity to lift'); *DFEH v. Albertson's, Inc.*, Dec. No. 03-05, 2003 WL 1244475, at \*12 (Cal.F.E.H.C.2003) (noting, among other things, that the complainant had 'lost approximately 50% of her preinjury capacity' for manual tasks). In citing that evidence, neither decision asked whether the claimant's preinjury capacity was 'average' or 'above average.' But implicit comparisons with the normal or average population also appear in the Commission's decisions. In citing evidence that the complainants had difficulty with tasks such as dressing and sleeping, the FEHC implicitly presumes that most people can perform those tasks without difficulty. *See, e.g., Cal. Dep't of Corr.*, 2003 WL 22733898, at \*8. And, in at least one decision, the FEHC made explicit this inherent comparison with a 'normal' or 'average' baseline. In *DFEH v. Jefferson Smurfit Corp.*, Dec. No. 98-01, 1997 WL 840033, at \*5 (Cal.F.E.H.C.1997), a limitation to a 40-hour work week was held not to limit a major life activity because 40 hours is 'considered a full work week in our culture.'

"By contrast, we have found no FEHC decisions that assess whether the complainant's limitations were worse than those of *other impaired people.* For instance, the FEHC noted that a complainant's bursitis and muscle strain 'interrupted her ability to sleep.' *Cal. Dep't of Corr.*, 2003 WL 22733898, at \*8. But the FEHC did not contemplate that the complainant's limitation would be minimized by the fact that many otherwise nondisabled people also suffer from conditions, such as jet lag or age related insomnia, that interrupt their ability to sleep.

"[U]nder FEHA and its relevant interpretations, the district court erred by holding that [the employees] are not limited in the major life activity of seeing simply because other people with common vision impairments are also limited. [The employees] demonstrated that seeing, and a variety of tasks for which seeing is commonly used, are made difficult for them because of their monocularity and consequent inability to perform stereopsis. FEHA requires no more." (*E.E.O.C. v. United Parcel Service, Inc.* (9th Cir. 2005) 424 F.3d 1060, 1071–1072, fn. omitted.)

a. *Actual Disability*

We conclude that Arteaga did not have an *actual* disability while employed by Brink's (see § 12926, subd. (k)(1)) because his symptoms did not make the performance of his job duties difficult as compared to his unimpaired state or to a normal or average baseline. (See *E.E.O.C. v. United Parcel Service, Inc., supra*, 424 F.3d at pp. 1071–1072.)

During his almost five years at Brink's, Arteaga never exhibited any signs of a medical problem. Nor did his supervisors ever see him suffering from

any medical condition. Arteaga spent much of the workday riding in the back of a vehicle with a coworker, but he does not contend he ever mentioned his pain or numbness to another member of the crew. Arteaga said his symptoms limited only his ability to play soccer, which is not a major life activity. He waited at least a year to mention them to management because he thought they were going away—and raised the subject only after learning he was under investigation for cash shortages. On one occasion, Arteaga asked Ruiz for a job change: a demotion to a guard position. His request, however, had nothing to do with a physical disability. Rather, he no longer wanted to be held responsible for shortages. His symptoms, perhaps bothersome, did not make accomplishing his job difficult.

We do not mean to belittle the pain or numbness Arteaga experienced. But those types of symptoms are often subjective, as they were here, and they did not create a problem for Arteaga in performing his job duties. He did not say what *kind* of pain he experienced, for example, tingling, aching, burning, stinging, stabbing, or throbbing. Nor did he use words indicating the *degree* of pain, such as minor, mild, moderate, severe, intense, extreme, or unbearable. He merely reported feeling "some kind of pain . . . , when waking up" and "[t]oday, in the morning, 3/17/04, I was unloading coins and . . . I started to feel the pain in my arms and fingers again." Given the matter-of-fact way in which Arteaga disclosed his condition, a reasonable employer would conclude that Arteaga's pain was not disabling.

Consistent with the insignificance of his symptoms, Arteaga had a medical examination about seven months before he disclosed them to Brink's and was found to be in good health. At the time of the exam, he completed a portion of the medical form, indicating he had not had any *illness* or *injury* in the previous *five years* and did not suffer from an "impaired hand, arm, foot, leg, finger, [or] toe." Nor did he have any muscular disease.

When Arteaga finally informed Brink's of his condition, a supervisor took him to a physician—once for the physical symptoms and later for the rash. Both times the physician found nothing wrong with Arteaga and sent him back to work without any restrictions. An employer does not have to accept an employee's subjective belief that he is disabled and may rely on medical information in that respect. (See, e.g., *Kennedy v. Superior Printing Co.* (6th Cir. 2000) 215 F.3d 650, 656; *Tyler v. Ispat Inland, Inc.* (7th Cir. 2001) 245 F.3d 969, 974 & fn. 1; *Burns v. Snow* (10th Cir. 2005) 130 Fed.Appx. 973, 977, 979, 982–983; *Timmons v. General Motors Corp. North America* (N.D.Ill. 2005) 390 F.Supp.2d 739, 749–751, affd. (7th Cir. 2006) 469 F.3d 1122; *Brettler v. Purdue University* (N.D.Ind. 2006) 408 F.Supp.2d 640, 647 & fn. 3, 664–665 & fn. 13; *Abdo v. University of Vermont* (D.Vt. 2003) 263 F.Supp.2d 772, 777–778; *Cameron v. Navistar Intern. Transp. Corp.* (N.D.Ill. 1998) 39 F.Supp.2d 1040, 1046 & fns. 5–7.)

As a federal district court stated in granting summary judgment for an employer under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. §§ 12101–12213): "In her response to [the employer's] motion for summary judgment, [the employee] failed to address which major life activity her carpal tunnel syndrome substantially limits. The court is unable to surmise any such limitation. In her deposition, [the employee] acknowledges that the carpal tunnel condition does not prevent her from participating in any activity and that she is fully able to do her job. . . . Although she generally alleges that *she suffers pain* as a result of the condition, *pain alone* without some corresponding limitation on activity *is insufficient* to establish a disabling impairment. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) ('moderate . . . pain . . . does not rise to the level of disability'); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 191 (5th Cir. 1996) (despite pain involved, ability to perform job precluded finding that work was substantially limited). [The employee] has failed to establish that her carpal tunnel syndrome substantially limits a major life activity." (*Gearhart v. Sears, Roebuck & Co., Inc.* (D.Kan. 1998) 27 F.Supp.2d 1263, 1273, italics added (*Gearhart*), affd. mem. (10th Cir. 1999) 194 F.3d 1320.)

 We recognize that, while the FEHA states that the employee's disease, disorder, or condition need only "limit" a major life activity (see § 12926, subd. (k)(1)(B), (k)(1)(B)(ii)), the ADA requires that the limitation be *substantial* (see 42 U.S.C. § 12102(2)(A); *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1022–1031 [130 Cal.Rptr.2d 662, 63 P.3d 220]). That difference aside, the point in *Gearhart* is applicable here: Pain alone does not always constitute or establish a disability. (See *Gearhart, supra,* 27 F.Supp.2d at p. 1273; accord, *Berg v. Norand Corp.* (8th Cir. 1999) 169 F.3d 1140, 1145; *Locklear v. Nicholson* (2006) 20 Vet.App. 410, 417; *Bones v. Honeywell Intern., Inc.* (D.Kan. 2002) 223 F.Supp.2d 1203, 1219–1221, affd. (10th Cir. 2004) 366 F.3d 869.) An assessment must be made to determine how, if at all, the pain affects the specific employee. In this case, the pain and numbness did not make work difficult for Arteaga.

Similarly, as the United States Supreme Court has explained: "It is insufficient for individuals attempting to prove disability status under [the ADA] to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence [concerning] the extent of the limitation [caused by their impairment] in terms of their own experience . . . .' . . . That the Act defines 'disability' 'with respect to an individual,' 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner. . . . 'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' . . .

"An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person. Carpal tunnel syndrome, one of [the plaintiff's] impairments, is just such a condition. While cases of severe carpal tunnel syndrome are characterized by muscle atrophy and extreme sensory deficits, mild cases generally do not have either of these effects and create only intermittent symptoms of numbness and tingling. . . . Studies have further shown that, even without surgical treatment, one quarter of carpal tunnel cases resolve in one month, but that in 22 percent of cases, symptoms last for eight years or longer. . . . Given these large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA." (*Toyota Motor Mfg., Ky., Inc. v. Williams* (2002) 534 U.S. 184, 198–199 [151 L.Ed.2d 615, 122 S.Ct. 681, 691–692], citations omitted.) That Arteaga was diagnosed with carpal tunnel syndrome after leaving Brink's does not mean he had a physical disability while there or, for that matter, at any time. The evidence establishes he was not disabled before or during his employment at Brink's.

Last, Arteaga complains that Brink's discriminated against him by not transferring him to another position. But "[a]n employee cannot demand clairvoyance of his employer." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443 [60 Cal.Rptr.3d 359].) First, the employee has a duty to inform the employer that he has a disability. (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222 [37 Cal.Rptr.3d 899].) " ' "[A]n employer [is not] ordinarily liable for failing to accommodate a disability of which it had no knowledge." ' " (*King*, at p. 443.) Brink's had no knowledge of a disability because, as we have explained, Arteaga did not have one. The company eventually learned that Arteaga had pain and numbness, but those symptoms did not interfere with the performance of his job. Nor did Arteaga have an alleged disability that was obvious or visible, such as blindness or paralysis. (See *Williamson v. International Paper Co.* (S.D.Ala. 1999) 85 F.Supp.2d 1184, 1195; *Rogers v. CH2M Hill, Inc.* (M.D.Ala. 1998) 18 F.Supp.2d 1328, 1334.) Second, " ' "[t]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. . . ." ' . . . 'It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the *earliest opportunity* with a concise list of restrictions which must be met to accommodate the employee.' " (*King*, at p. 443, italics added, citation omitted.) Arteaga waited at least a year, possibly two, to notify Brink's of his alleged disability, and his request for a job transfer—a demotion to a guard position—was based on his desire to avoid responsibility for shortages, not on his physical condition.

### b. *Record or History of Disability*

Given that Arteaga did not have a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment constituting a physical disability—before or during his employment at Brink's—he could not have been the victim of discrimination for having a *known record or history* of that sort. (See § 12926, subd. (k)(3).)

### c. *Perceived Disability*

Nor did Brink's regard or treat Arteaga *as if he had* a physical condition, past or present, that made achievement of a major life activity difficult. (See § 12926, subd. (k)(4).) His medical examinations—in August 2003 and March 2004—showed that Arteaga was in good health. Brink's had no reason to believe otherwise. The company did not mistakenly conclude that Arteaga had, or previously had, a condition that made working difficult, nor did it mistakenly believe that any nonlimiting condition made it difficult for him to work. (See *Sutton v. United Air Lines, Inc.* (1999) 527 U.S. 471, 489 [144 L.Ed.2d 450, 119 S.Ct. 2139, 2149–2150].) As far as Brink's was concerned, Arteaga was simply complaining about pain and numbness that had been coming and going for a year or more, but which did not affect the achievement of his job duties.

### d. *Potential Disability*

Brink's did not regard or treat Arteaga as having a disease, disorder, condition, or health impairment, past or present, that might *become* a physical disability. (See § 12926, subd. (k)(5).) Arteaga never indicated that the number or severity of his symptoms had increased over time. To hear Arteaga tell it, the same symptoms had been somewhat intermittent—"I thought the pain [was] going away"—and, when the pain and numbness resurfaced, their severity was unchanged. In short, there was no indication Arteaga's symptoms were getting, or might get, worse. He was still suffering from pain in his arms and shoulders as well as numbness in his fingers and arms when he accepted employment after he left Brink's. Yet he took a virtually identical job at Sectran, albeit one that involved shipments containing fewer coins and more paper. At Sectran, Arteaga performed well and had no difficulty. We cannot say that Brink's took any action against Arteaga based on a concern about a possible future disability.

Arteaga discusses the FEHA's prohibition against *potential* disability discrimination as if the existence of the statute alone were sufficient to prove liability. But facts are needed to show that the statute was violated. Likewise, evidence that a discharged employee had *non*disabling symptoms—pain and

numbness—during his employment does not support an inference that the employer discharged him because of a potential disability. Something more must be shown. Otherwise, every headache would give rise to a triable claim.

For example, in *American National Ins. Co. v. Fair Employment & Housing Com.* (1982) 32 Cal.3d 603 [186 Cal.Rptr. 345, 651 P.2d 1151], the employer terminated an employee, a door-to-door insurance salesman, because he had high blood pressure. The employer believed that, although high blood pressure did not impair the employee's ability to work, it exposed him to a greater than normal risk of disability or death. The employer regarded sales work as stressful and had a policy against employing persons with elevated blood pressure. In agreeing with the trial court that the employer had engaged in disability discrimination, our Supreme Court stated: "To limit 'handicap' to present disabilities would defy logic. In effect that would proscribe discrimination based on current, manifest, physical disfunction while allowing exclusion on the basis of conditions—like high blood pressure—that may handicap in the future but have no presently disabling effect." (*Id.* at p. 610; see *MacPhail v. Court of Appeal* (1985) 39 Cal.3d 454, 456–457 & fn. 3 [217 Cal.Rptr. 36, 703 P.2d 374] [applicant may pursue disability discrimination claim where employer refused to hire him, believing that applicant's spinal anomaly presented higher than average risk of back injury].) By comparison, there is no evidence here that Brink's thought Arteaga's pain or numbness created a greater than normal risk of injury, disability, or death, or that Brink's had doubts about Arteaga's future health.

Finally, Arteaga argues that an employee may have a physical disability even after he or she has been *released* by a physician *without work restrictions*, citing *Raytheon Co. v. Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1245–1249 [261 Cal.Rptr. 197] (*Raytheon Co.*) and *Angell v. Peterson Tractor, Inc.* (1994) 21 Cal.App.4th 981, 987 [26 Cal.Rptr.2d 541] (*Angell*), overruled on another point in *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1147–1148 [77 Cal.Rptr.2d 445, 959 P.2d 752]. That is not always so. (See *Glover v. NMC Homecare, Inc.* (D.Kan. 2000) 106 F.Supp.2d 1151, 1167 [employee who is no longer suffering from depression is not disabled], affd. mem. (10th Cir. 2001) 13 Fed.Appx. 896; *Bennett v. Calabrian Chemicals Corp.* (E.D.Tex. 2004) 324 F.Supp.2d 815, 828–831 [employee is not disabled after successful surgery for peripheral artery disease], affd. (5th Cir. 2005) 126 Fed.Appx. 171.)

But frequently, as Arteaga points out, an employee is initially diagnosed with a disability, is placed under a physician's care, and eventually returns to work without any restrictions. In *Raytheon Co.*, the employee had AIDS but was asymptomatic during most of his employment. In *Angell*, the employee

had a series of heart attacks but recovered while employed. Yet both employees were still physically disabled. (See *Raytheon Co.*, *supra*, 212 Cal.App.3d at pp. 1248–1250 [AIDS gets progressively worse and would seriously impair employee's abilities in the future]; *Angell*, *supra*, 21 Cal.App.4th at pp. 986–987 [employee's heart condition makes achievements unusually difficult]; see also § 12926.1, subd. (c) [physical disabilities include chronic or episodic conditions such as AIDS and heart disease].) Neither case applies here, however, because Arteaga was not diagnosed with a physical disability before or during his employment at Brink's. He *did suffer* from his symptoms—pain and numbness—*while* employed by Brink's, but a physician determined twice that he was fine.

In sum, using the vernacular of the FEHA, Arteaga did not have a physiological disease, disorder, or condition affecting his neurological or musculoskeletal systems, special sense organs, or skin that made it difficult for him to achieve the major life activity of working. In other words, he did not have an actual "physical disability." Nor was he treated as having a record or history of one. Further, he was not regarded or treated as having, or having had, a "physical disability" or as having, or having had, a disease, disorder, condition, or health impairment that might become a "physical disability." Consequently, Brink's has shown as a matter of law that Arteaga could not establish a prima facie case of disability discrimination under the FEHA. The trial court was correct in summarily adjudicating the FEHA claim in Brink's favor at the prima facie stage.

### 2. *Nondiscriminatory Reason for Termination*

Assuming for the sake of argument that Arteaga established a prima facie case, Brink's proffered evidence of a legitimate, nondiscriminatory reason for his discharge: Management lost confidence in him. As pointed out in the March 23, 2004 letter of termination: "After several weeks of research and investigation, it has been determined that since October 2003, there have been several shortages totaling $7,668.00 from ATM Machines that you serviced as a Messenger. In each case it was determined that you were the only person to service the ATM Machine." The letter also indicated that the loss of confidence was based on Arteaga's "overall performance while employed by Brink's."

█ Given the nature of Brink's business, the loss of confidence in an employee who occupies a messenger position is a legitimate, nondiscriminatory reason for discharge. (See *Quick v. Bozeman School Dist. No. 7* (1999), 295 Mont. 240, 248 [1999 MT 175, 983 P.2d 402, 407]; *Springer v. Blue Cross and Blue Shield* (Wyo. 1997) 944 P.2d 1173, 1175, 1176.) And Brink's made a strong showing that its loss of confidence in Arteaga was the reason for his termination.

### 3. *Pretext*

Arteaga must show there is a disputed fact as to the reason for his discharge. But his attempt to demonstrate pretext fails. He offers several unconvincing arguments.

 First, Arteaga contends he was terminated so soon after disclosing his "physical disability"—less than a week—that the timing, by itself, raises a dispute as to the company's true motivation. Not so. Because the employee's burden of establishing a prima facie case under *McDonnell Douglas* is fairly minimal, the temporal proximity between an employee's disclosure of his symptoms and a subsequent termination may satisfy the causation requirement at the *first step* of the burden-shifting process. (See *Smith v. Allen Health Systems, Inc.* (8th Cir. 2002) 302 F.3d 827, 832–833; *Annett v. University of Kansas* (10th Cir. 2004) 371 F.3d 1233, 1240–1241; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652].)

But temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination. (See *Smith v. Allen Health Systems, Inc., supra,* 302 F.3d at pp. 833–834; *Annett v. University of Kansas, supra,* 371 F.3d at p. 1241; *Sprenger v. Federal Home Loan Bank of Des Moines* (8th Cir. 2001) 253 F.3d 1106, 1113–1114; *Barnes v. Crowne Investments, Inc.* (S.D.Ala. 2005) 391 F.Supp.2d 1108, 1117–1118; *Shoaf v. Kimberly-Clark Corp.* (M.D.N.C. 2003) 294 F.Supp.2d 746, 757–758.) This is especially so where the employer raised questions about the employee's performance *before* he disclosed his symptoms, and the subsequent termination was based on those performance issues. (See *Smith v. Allen Health Systems, Inc., supra,* 302 F.3d at p. 834; *Strong v. University Healthcare System, L.L.C.* (5th Cir. 2007) 482 F.3d 802, 808; *Arraleh v. County of Ramsey* (8th Cir. 2006) 461 F.3d 967, 977–978; *Smith v. Ashland, Inc.* (8th Cir. 2001) 250 F.3d 1167, 1173–1174.) It follows that temporal proximity, by itself, does not support a finding of pretext here. "Standing alone against Defendant's strongly supported legitimate reason for terminating [plaintiff], temporal proximity does not amount to more than a scintilla of evidence of [discrimination]." (*Padron v. BellSouth Telecommunications, Inc.* (S.D.Fla. 2002) 196 F.Supp.2d 1250, 1257, affd. mem. (11th Cir. 2003) 62 Fed.Appx. 317.)

This is not to say that temporal proximity is never relevant in the final step of the *McDonnell Douglas* test. In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity—disclosing a disability—is suddenly accused of serious performance problems, subjected to derogatory

comments about the protected activity, and terminated. In those circumstances, temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext. (See, e.g., *Shirley v. Chrysler First, Inc.* (5th Cir. 1992) 970 F.2d 39, 42–44; *Moss v. Bluecross, Blue Shield of Kansas, Inc.* (D.Kan. 2008) 534 F.Supp.2d 1190, 1202–1204.) But that is not this case.

*Before* Arteaga disclosed his symptoms, his performance had long been the subject of criticism, he had been suspended on one occasion, and he knew Brink's was already investigating a shortage on one of his runs. *After* the disclosure, no one made any negative remarks about his condition.

■ An employee, fearing that his job is on the line, may not raise an old wound as a preemptive strike to escape appropriate discipline or discharge. As stated by one court: "To prevent future litigants from relying on temporal proximity alone to establish [pretext], we once again attempt to clarify the issue. . . . '[C]ases that accept mere temporal proximity . . . as sufficient evidence of causality *to establish a prima facie case* uniformly hold that the temporal proximity must be "very close." ' . . . [T]o be persuasive evidence, temporal proximity must be very close, and importantly . . . temporal proximity alone, when very close, can in some instances establish a *prima facie case* of [discrimination or] retaliation. . . . But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of [pretext]. Such a rule would unnecessarily tie the hands of employers.

"Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace. . . . Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity . . . ." (*Strong v. University Healthcare System, L.L.C.*, *supra*, 482 F.3d at p. 808, citations omitted; accord, *Taylor v. Volunteers of Am.* (2003) 153 Ohio App. 3d 698, 702 [2003 Ohio 4306, 795 N.E.2d 716, 719].)

For his second argument, Arteaga emphasizes that the ATM involved in the March 1, 2004 shortage had mechanical problems. Yet his termination was not based solely on the March 1 incident, involving a shortage of $4,540, but on—as the termination letter stated—Arteaga's "overall performance while employed by Brink's" and a shortage of $7,668. That performance, even without the March 1 incident, was sufficient to support a loss of confidence in Arteaga.

Third, Arteaga questions how Brink's came up with the shortage figure of $7,668. The record does not provide an answer. Nor does Brink's offer an explanation in its appellate brief. But the issue is irrelevant in light of the significantly *higher* amount of undisputed shortages that occurred during Arteaga's *entire* length of employment.

Fourth, Arteaga—like Brink's itself—engages in a lengthy discussion about the similarities and dissimilarities between Arteaga's situation and the discharge of another employee who was supposedly terminated for mishandling a shipment. That discussion gets so bogged down in minutiae that the evidence does not contribute anything to either side under *McDonnell Douglas*.

Last, Arteaga states that yet another employee, identified only as "Compos," had a $30,000 shortage and did not get discharged. But this argument was not presented in the trial court, and its supporting facts were not contained in the parties' separate statements or their points and authorities. By coincidence, the only reference to the Compos incident appeared on a deposition page that *Brink's* submitted to support a *different* point. Arteaga attempts to take advantage of this happenstance for the first time on appeal. Brink's counters that, if Arteaga had mentioned the Compos issue in the trial court, the company would have offered argument and additional evidence on the matter. Regardless, because Arteaga did not raise this point below or rely on the supporting facts in the trial court, we consider the argument waived. (See *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 640–641 [134 Cal.Rptr.2d 273]; *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237–238 [118 Cal.Rptr.2d 313]; *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1526, fn. 3 [80 Cal.Rptr.2d 94].)

## C. *Wrongful Termination of Employment*

 Arteaga's common law claim for wrongful termination is premised on the prohibitions set forth in the FEHA (see *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 894–897 [66 Cal.Rptr.2d 888, 941 P.2d 1157]) and Labor Code section 132a (see *City of Moorpark v. Superior Court, supra,* 18 Cal.4th at pp. 1158–1161). As stated, the FEHA expressly prohibits physical disability discrimination. (See § 12940, subd. (a).) Labor Code section 132a makes it unlawful for an employer to retaliate "against any employee because he or she has filed or made known his or her intention to file a claim for [workers'] compensation with his or her employer." (Lab. Code, § 132a, subd. (1).)

### 1. *Wrongful Termination Alleging Disability Discrimination*

The elements of Arteaga's common law disability termination claim are the same as those of his FEHA claim. The wrongful termination claim is, after all, based on the FEHA's prohibition of physical disability discrimination. As a result, the wrongful termination claim fails for the same reasons as the FEHA claim. (See *Le Bourgeois v. Fireplace Manufacturers, Inc.* (1998) 68 Cal.App.4th 1049, 1060, fn. 14 [80 Cal.Rptr.2d 660]; see also pt. II.B., *ante.*)

## 2. *Wrongful Termination Alleging Workers' Compensation Retaliation*

■ In reviewing the summary adjudication of the retaliation claim, we apply the burden-shifting test from *McDonnell Douglas*. (See pt. II.B., *ante*; *Crown Appliance v. Workers' Comp. Appeals Bd.* (2004) 115 Cal.App.4th 620, 624–625 [9 Cal.Rptr.3d 415] (*Crown*).)

### a. *Prima Facie Case*

■ To establish a prima facie case of retaliation, a plaintiff must show (1) he or she engaged in conduct protected by Labor Code section 132a, (2) the employer subjected him or her to an adverse employment action, and (3) there is a causal link between the two. (See *Crown*, *supra*, 115 Cal.App.4th at pp. 624–625; *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 [37 Cal.Rptr.3d 113].)

Here, Arteaga filed workers' compensation claims with Brink's—conduct protected by Labor Code section 132a. His employment was terminated, which constituted an adverse employment action. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) And he was terminated within a few days of filing the claims, satisfying the prima facie requirement of a causal link. (See *Morgan v. Regents of University of California*, *supra*, 88 Cal.App.4th at p. 69.)

### b. *Nonretaliatory Reason for Termination*

Brink's stated reason for terminating Arteaga is, not surprisingly, the same for both the retaliation and the disability discrimination claims: Management lost confidence in him. We have already discussed this aspect of the *McDonnell Douglas* test with respect to the statutory disability discrimination claim. (See pt. II.B.2., *ante*.) In moving for summary judgment, Brink's submitted adequate evidence to support its stated reason for Arteaga's termination.

### c. *Pretext*

In attempting to dispute Brink's reason for his termination, Arteaga makes two arguments. Neither carries the day.

First, Brink's had a profit-sharing plan covering all employees under which bonuses would be paid on a quarterly basis. The profits would be reduced, however, by an increase in workers' compensation insurance premiums—in the same way as if other operating expenses increased. Workers' compensation premiums are based, in part, on the employer's claims history. (See *P. W. Stephens, Inc. v. State Compensation Ins. Fund* (1994) 21 Cal.App.4th 1833,

1836–1839 [27 Cal.Rptr.2d 107]; *State Comp. Ins. Fund v. McConnell* (1956) 46 Cal.2d 330, 337–340 & fn. 1 [294 P.2d 440].) From this, Arteaga jumps to the conclusion that Brink's had a financial incentive to discharge him—and did so—to protect its profit level.

This argument is flawed. For one thing, the California Supreme Court has upheld the validity of this type of profit-sharing plan even though the profits are reduced by workers' compensation expenses, stating that the plan is beneficial to both employers and employees. (See *Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 226–244 [64 Cal.Rptr.3d 407, 165 P.3d 133].) Further, Brink's statistical evidence—40 other employees filed workers' compensation claims, and none was discharged—is compelling. Arteaga is the only employee out of 41 to file a workers' compensation claim *and* be terminated, indicating that something other than filing a claim was the reason for his discharge. The record supports only one other possibility: Management lost confidence in him.

That leaves Arteaga with his second contention: He has shown pretext because he was terminated just days after filing the workers' compensation claims. Timing alone, he argues, proves that Brink's stated reason for his discharge is pretextual. But, as we discussed in connection with the FEHA claim, temporal proximity by itself, while sufficient to establish a prima facie case, is not adequate to show pretext. (See pt. II.B.3., *ante.*)

 Where the employee relies solely on temporal proximity in response to the employer's evidence of a nonretaliatory reason for termination, he or she does not create a triable issue as to pretext, and summary judgment for the employer is proper. (See *Smith v. Allen Health Systems, Inc., supra,* 302 F.3d at pp. 833–834; *Strong v. University Healthcare System, L.L.C., supra,* 482 F.3d at p. 808; *Arraleh v. County of Ramsey, supra,* 461 F.3d at pp. 977–978; *Annett v. University of Kansas, supra,* 371 F.3d at p. 1241; *Smith v. Ashland, Inc., supra,* 250 F.3d at pp. 1173–1174; *Barnes v. Crowne Investments, Inc., supra,* 391 F.Supp.2d at pp. 1117–1118; *Shoaf v. Kimberly-Clark Corp., supra,* 294 F.Supp.2d at pp. 757–758.)

Thus, the trial court properly granted summary judgment in favor of Brink's. In addition, because the evidence does not support Arteaga's contention that Brink's had legitimate *and illegitimate* reasons for his termination, we do not decide whether a mixed-motive analysis applies under the FEHA or in this case. (See *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111, fn. 11 [16 Cal.Rptr.3d 717]; *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748–1749 & fn. 3 [52 Cal.Rptr.2d 620]; com. to BAJI No. 12.26 (spring ed. 2008) p. 846.)

## III

## DISPOSITION

The judgment is affirmed.

Vogel, J., and Rothschild, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 13, 2008, S164639.