Filed 3/11/14  Owens v. American Cable Services CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RONNIE OWENS,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>AMERICAN CABLE SERVICES, LLC,<br>et al.,<br><br>　　　　Defendants and Respondents. | B246566<br><br>(Los Angeles County<br>Super. Ct. No. BC441242) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Malcolm Mackey, Judge.  Reversed.


Mesriani Law Group, Zachary M. Cantor for Plaintiff and Appellant.


Guy C. Nicholson, Linda J. Kim for Defendants and Respondents.

_____

Appellant appeals from a judgment entered after the trial court granted respondents' motion for summary judgment or summary adjudication. Respondents assert that appellant cannot establish his claims for disability discrimination because he was not disabled. We find that appellant raised triable issues of fact that respondents regarded appellant as having a physical disability or a condition that could become a disability. We further find that appellant raised triable issues of fact pertaining to whether both respondents are potentially liable for the alleged discrimination. Accordingly, we reverse the judgment.

## BACKGROUND

Plaintiff and appellant Ronnie Owens filed a complaint in July 2010 against defendants and respondents (i) American Cable Services, LLC (ACS), Owens's former employer, and (ii) the "managing member" of ACS, R. Mitchel, Inc. (R. Mitchel). Owens's complaint alleged seven causes of action: (1) physical disability discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.); (2) physical disability harassment in violation of FEHA; (3) failure to engage in the interactive process of accommodation in violation of FEHA; (4) failure to accommodate disability in violation of FEHA; (5) wrongful termination in violation of public policy, FEHA; (6) intentional infliction of emotional distress; and (7) negligent infliction of emotional distress.

**Facts**

In August 2012, defendants filed a motion for summary judgment or, in the alternative, summary adjudication. Evidence presented in connection with the motion included the following:

Owens was hired as a warehouse cable stripper at ACS in October 2008. ACS was a business that processed recyclable copper and lead from telecommunications cable at its processing facility in Los Angeles. R. Mitchel was a business that recycled plastic and metal. ACS shared loading docks with R. Mitchel, as well as a mailing address. ACS and R. Mitchel had the same president and chief executive officer, Dennis Brown.

2

Various employees performed duties both for ACS and R. Mitchel, and personnel files for both companies were housed in R. Mitchel's offices.

Because ACS was in the business of processing hazardous items, it engaged a medical doctor, Dr. Claudio Hoegel, to monitor its employees for exposure to lead and other toxic materials. When Owens first began working at ACS, he had a level of three micrograms of lead per deciliter of blood. Owens claims that he soon began experiencing symptoms including headaches, fatigue, diarrhea, nausea, lack of sex drive, vomiting, stomach aches, physical weakness, and flu-like symptoms, and he complained to ACS and Dr. Hoegel about his symptoms.

When tested on October 29, 2008, Owens had a blood-lead level of 22, and on November 6, 2008, his level was 21. On November 6, 2008, Dr. Hoegel filled out a report sheet for Owens to provide to ACS. The report listed "lead toxicity" as the diagnosis and contained the instruction "remove from lead exposure." As a result of Dr. Hoegel's report, Owens was sent home on paid leave for several weeks.

On November 26, 2008, Dr. Hoegel cleared Owens to return to his normal work duties. Owens claims that upon returning to work he began experiencing the same symptoms as previously, and that he asked to be assigned tasks not involving lead exposure but his request was denied. A blood test administered on December 19, 2008, registered a blood-lead level of 14.

On January 20, 2009, Owens told his supervisor that he believed he was feeling ill due to lead exposure. He requested a medical examination and was again sent to Dr. Hoegel. After seeing Owens, Dr. Hoegel filled out another report listing "lead toxicity" as the diagnosis and containing the recommendation "remove from lead exposure." Dr. Hoegel ordered another blood test. The results, received on January 22, 2009, showed a blood-lead level of 21. On January 23, 2009, Dr. Hoegel cleared Owens to return to work. On approximately February 2, 2009, Owens's employment was terminated.

**Motion and Judgment**

Defendants' motion for summary judgment and/or adjudication was based on two primary arguments: (1) Owens was not employed by R. Mitchel and therefore R. Mitchel

3

had no potential liability, and (2) Owens did not have a physiological disability when his employment was terminated. In support of the first contention, defendants submitted evidence that R. Mitchel and ACS were separately formed, and that R. Mitchel was the "managing member" of ACS.

In support of the second argument, defendants submitted evidence tending to show that Owens never had lead poisoning. A retained expert witness, Dr. Paul Joseph Papanek, declared that the Division of Occupational Safety and Health (Cal OSHA) permits employees to continue working as long as their blood-lead levels are below 50, unless they are removed from exposure by a treating physician for specific reasons. Blood tests administered on Owens never showed a blood-lead level higher than 22. According to Dr. Papanek, no physical symptoms would be expected at such a level. Dr. Hoegel separately declared that the medically acceptable range for an individual blood-lead level is zero to 40, and Owens was always within the acceptable range. Dr. Hoegel further stated that any symptoms Owens complained about were not caused by an unacceptable level of lead in his blood, and that when he "recommended that the Plaintiff be taken out of the work place, it was not due to an excessive amount of lead in Plaintiff's body. I did it as a precautionary move since the Plaintiff was complaining to me about the above-mentioned symptoms."

Owens opposed the motion by arguing that R. Mitchel and ACS were "joint employers" or "integrated enterprises," in that the companies shared facilities, hardware, mailing addresses, ownership, personnel, management, and the authority to hire and fire. Owens further argued that, regardless of whether or not he had lead poisoning, he had a physical disability consisting of the symptoms he complained about while working at ACS. Moreover, at a minimum, he was regarded by his employer as having a physical disability, giving rise to FEHA protection.

The trial court ruled in favor of defendants. It found that Owens was employed solely by ACS, and therefore R. Mitchel had no potential liability. It further found that Owens's blood-lead levels were within the medically accepted limit and he had no disability. Moreover, Owens was not treated by ACS as if he had a disability. The trial

4

court ordered all causes of action against R. Mitchel dismissed, and all FEHA claims against ACS dismissed, leaving only the intentional infliction of emotional distress and negligent infliction of emotional distress claims remaining.

Owens subsequently dismissed without prejudice the remaining two causes of action against ACS. Judgment was then entered in favor of ACS and R. Mitchel. Owens timely appealed.

## DISCUSSION

Summary judgment must be granted if the papers show an absence of triable issues of material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A motion for summary adjudication may be brought to dispose of individual causes of action. (Code Civ. Proc., § 437c, subd. (f)(1).) A defendant meets its burden on summary judgment or summary adjudication by showing that one of more elements of the plaintiff's causes of action cannot be proven, or by establishing a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2).) The burden then shifts to the plaintiff to show a triable issue of fact material to the causes of action or defense. (*Ibid.*) We evaluate a summary judgment/adjudication ruling de novo, independently reviewing the record to determine whether there are any triable issues of material fact. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "In practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1258.) In general, we give no deference to the trial court's ruling or reasoning, and only decide whether the right result was reached. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) In deciding a summary judgment/adjudication motion, the court analyzes the evidence "including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party." (*Garcia v. W&W Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1041.)

5

## I. Physical Disability

In a case alleging disability discrimination, the plaintiff bears the ultimate burden of proving that the employer engaged in intentional discrimination. "'First, it is the plaintiff's burden to prove by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff proves the prima facie case, then the burden shifts to the defendant to provide some legitimate nondiscriminatory reason for its employment decision. Third, if the defendant carries this burden, then the plaintiff must have an opportunity to show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 823.)

This burden is reversed, however, on summary judgment or summary adjudication, where the employer bears the initial burden of showing that the plaintiff cannot prove his or her claim. "In such pretrial proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203.)

As presented to the trial court and on appeal, the issue of whether Owens's causes of action survive summary judgment/adjudication depends on whether he raised a triable issue of fact that he suffered from an FEHA-defined "physical disability." FEHA prohibits employment discrimination for a physical disability. (Gov. Code, § 12940, subd. (a).) FEHA specifically provides for a broad interpretation of its protective scope: "The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental

6

impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." (Gov Code, § 12926.1, subd. (b).) "The provisions of this part shall be construed liberally for the accomplishment of the purposes of this part." (Gov. Code, § 12993, subd. (a).)

In keeping with the Legislature's intent, FEHA's definition of "physical disability" is broad. It includes having a "physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss," that affects any one of a wide range of bodily systems, and that "limits a major life activity." (Gov. Code, § 12926, subd. (m)(1).) A disability "limits a major life activity it if makes the achievement of the major life activity difficult." (Gov. Code, § 12926, subd. (m)(1)(B)(ii).) "Working" is a "major life activity." (Gov. Code, § 12926, subd. (m)(1)(B)(iii).)

Defendants here submitted evidence showing that Owens did not suffer from lead poisoning. Owens did not counter this showing. But he did submit evidence, based on his own deposition testimony, that he suffered from various ailments including headaches, fatigue, stomach aches, and physical weakness. His failure to prove that he suffered from lead poisoning itself was not dispositive. "'"The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."'" (*Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 348 (*Arteaga*).)

Nevertheless, Owens did not raise a triable issue of fact that he suffered from a physical disability as defined by Government Code section 12926, subdivision (m)(1). This is because his opposition papers did not show that his symptoms made a major life activity, such as working, difficult. (See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46-48 [plaintiff could not simply allege an injury or physical condition, but was required to demonstrate that achievement of a major life activity was made difficult].) Although the record contains evidence that Owens complained of his symptoms to ACS and was granted periods of leave, the record does not establish (by declaration of Owens or otherwise) that his symptoms rendered work, or any other major life activity, difficult.

This does not end our analysis, though. FEHA also defines "physical disability" as including "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult" (Gov. Code, § 12926, subd. (m)(4)) and, separately, "[b]eing regarded or treated by the employer . . . as having, or having had, a disease, disorder, condition, . . . or health impairment that has no present disabling effect but may become a physical disability . . . ." (Gov. Code, § 12926, subd. (m)(5).) Drawing all reasonable inferences in Owens's favor, as we must on summary judgment or adjudication, we find that Owens raised a triable issue of fact that he suffered from a disability as defined in these two provisions.

The evidence supporting this finding comes largely from Dr. Hoegel. On two separate occasions after examining Owens, Dr. Hoegel wrote report sheets for transmittal to ACS listing "lead toxicity" as the diagnosis and instructing that Owens be removed from lead exposure. On both of these occasions, Owens was given paid leave by ACS. Thus, viewing the evidence in Owens's favor, there is a triable issue of fact as to whether ACS regarded Owens as having a physical condition—lead toxicity—that made achievement of a major life activity—working—difficult.

Defendants attempt to argue against this conclusion by pointing out that Dr. Hoegel's declaration stated: "At all times, when I recommended that the Plaintiff be taken out of the work place, it was not due to an excessive amount of lead in Plaintiff's body. I did it as a precautionary move since the Plaintiff was complaining to me about the above-mentioned symptoms." This statement does not change our analysis, because Dr. Hoegel does not state that he communicated these thoughts to ACS. The evidence merely shows that ACS received two reports with the diagnosis "lead toxicity." Furthermore, even if ACS did temporarily remove Owens from his duties only as a precautionary measure, defendants still must contend with the definition found in Government Code section 12926, subdivision (m)(5), which covers health impairments that have no present disabling effect but may become a physical disability. A reasonable inference of the evidence presented is that ACS granted Owens time off from work

8

because it believed he had a health impairment that, if ignored, could become a physical disability.

Defendants argue that *Arteaga* supports their position. We disagree. The facts in *Arteaga* are distinguishable from this case. Shortly before the plaintiff in *Arteaga* was fired as a result of an investigation into missing cash, he notified his employer for the first time that he suffered from pain and numbness in his arms, fingers, shoulder, and feet. (163 Cal.App.4th at p. 334.) There was no evidence that the plaintiff's symptoms made the performance of his job duties difficult, or that the employer regarded the symptoms as making a major life activity difficult. (*Id.* at pp. 346-350.) Here, in response to Owens's separate statement, defendants did not dispute that he informed ACS "regarding the symptoms he was experiencing" and that he complained "he was feeling ill due to what he believed to be lead exposure." Moreover, unlike in *Arteaga*, where a physician found nothing wrong and sent the plaintiff back to work without restrictions (*id.* at p. 347), Dr. Hoegel instructed ACS to remove Owens from work, and ACS granted Owens paid leave. Thus, there are triable issues of fact whether ACS regarded Owens as having a condition that made work difficult or that could become a physical disability.

Finally, defendants argue that Owens's employment was terminated for a legitimate reason having nothing to do with his supposed disability—he failed to report for work as scheduled, without notice or excuse. This point very well could have warranted summary judgment or adjudication, if defendants had only sought summary judgment or adjudication on this basis. They did not, however, and thus Owens had no opportunity or reason to attempt to dispute this issue of fact. Nor was this reason for terminating Owens's employment raised in defendants' separate statement of undisputed material facts filed in support of their motion. Under these circumstances, we are unable to hold that summary judgment or adjudication would have been proper on this basis. (See *Roger H. Proulx & Co. v. Crest-Liners, Inc.* (2002) 98 Cal.App.4th 182, 203-204 [factual issues raised for first time on appeal not considered].)

9

## II. R. Mitchel's Potential Liability

The trial court found that ACS was Owens's sole employer and therefore Owens could state no viable claim against R. Mitchel. Owens argues that this finding is incorrect because ACS and R. Mitchel were integrally related—they shared common facilities; they kept common employee personnel files; they shared a common founder and CEO; R. Mitchel employees handled the day-to-day operations of ACS; and R. Mitchel employees had the authority to hire, discipline, and terminate Owens.

FEHA's prohibitions against discrimination only apply to employers. (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 (*Vernon*).) However, an "employer" may include more than just the company that nominally employs the plaintiff. "FEHA requires 'some connection with an employment relationship,' although the connection 'need not necessarily be direct.'" (*Ibid.*) Owens argues that ACS and R. Mitchel were "integrated enterprises" or "joint employers," and each could be liable for discrimination pursuant to *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, *Vernon*, and like authority.

The opinions relied on by Owens examined the extent of control that one entity had over a second entity's employees. In general, an entity that exerts an unusual amount of control over a second entity's employees can be subject to employment discrimination liability. (See *Laird v. Capital Cities/ABC, Inc.*, *supra*, 68 Cal.App.4th at p. 738 [plaintiff could show companies sufficiently interrelated by demonstrating parent corporation "exercised control 'to a degree that exceeds the control normally exercised by a parent corporation'"]; *Vernon*, *supra*, 116 Cal.App.4th 124 [court is to examine "'totality of circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties"].)

Defendants correctly point out that ACS is a limited liability company, and the cases relied on by Owens did not involve limited liability companies. In a member-managed limited liability company, management and conduct of the company is vested in

the members.  (Corp. Code, § 17704.07, subd.(b)(2).)[1]  In general, liabilities of a limited liability company are solely its own.  (Corp. Code, § 17703.04, subd. (a)(1).)[2]  "They do not become the . . . liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager for the limited liability company." (Corp. Code, § 17703.04, subd. (a)(2).)  Defendants submitted evidence that R. Mitchel is the managing member of ACS.  Further, the evidence presented regarding R. Mitchel's relationship with ACS showed that R. Mitchel performed the tasks expected of one entity managing another.  Under the Corporations Code, R. Mitchel cannot face liability simply because it was performing its duties as managing member.  Although a member of a limited liability company can be subject to alter ego liability (Corp. Code, § 17703.04, subd. (b)), Owens made no alter ego allegations.

Nevertheless, a member of a limited liability company can be liable "to third parties for the member's participation in tortious conduct."  (Corp. Code, § 17703.04, subd. (c).)  Put another way, "whereas managers of limited liability companies may not be held liable for the wrongful conduct of the companies *merely* because of the managers' status, they may nonetheless be held accountable . . . for their personal participation in tortious or criminal conduct, even when performing their duties as manager."  (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1213.) Here, Owens raised triable issues of fact that he suffered discrimination and that R. Mitchel personally participated in the discrimination.[3]  Summary judgment in favor of R. Mitchel was therefore improper.

---

[1]     Effective January 1, 2014, Corporations Code section 17704.07 replaced former Corporation Code sections 17004, 17103, 17104, 17150, 17151, 17152, 17154, and 17156.

[2]     Effective January 1, 2014, Corporations Code section 17703.04 replaced former Corporations Code sections 17101 and 17158.

[3]     Defendants' reliance on *Reno v. Baird* (1998) 18 Cal.4th 640 and *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55 is misplaced.  Both cases concluded that individuals who do not qualify as employers are not potentially personally liable under

11

## DISPOSITION

The judgment is reversed.  Owens is awarded his costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

---

FEHA for discriminatory acts.  (*Reno v. Baird*, *supra*, 18 Cal.4th at p. 663; *Janken*, *supra*, 46 Cal.App.4th at p. 65.)  R. Mitchel is a corporation, not an individual, and is also an employer.

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.