Filed 6/3/22  Joseph v. Cal. Dept. of Corrections CA4/2
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| VICTOR JOSEPH, | |
| Plaintiff and Appellant, | E074481 |
| v. | (Super.Ct.No. RIC1607364) |
| CALIFORNIA DEPARTMENT OF CORRECTIONS et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Chad W. Firetag, Judge.  Affirmed.

Mark S. Ravis, for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper, Evan R. Sorem, and Jodi L. Cleesattle Deputy Attorneys General, for Defendants and Respondents.

1

In this employment retaliation case, the trial court granted summary judgment to the defendants.[1] Plaintiff and appellant Victor Joseph contends that he produced sufficient evidence to survive summary judgment as to three of the defendants on his claim under the California Whistleblower Protection Act (WPA) (Gov. Code[2], § 8547 et seq.) by demonstrating that the reasons for his termination were pretextual.[3] In a previous unpublished opinion, we disagreed that he produced such evidence and therefore affirmed the judgment. Our Supreme Court then granted Joseph's petition for review and transferred the matter to us with directions to vacate the opinion and reconsider the cause in light of *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal. 5th 703 (*Lawson*). We vacated our opinion and requested supplemental briefing, which the parties submitted.

Having reconsidered the matter in light of *Lawson*, our conclusion remains unchanged. The trial court was correct to grant summary judgment to the defendants, so we affirm the judgment.

---

[1] The named defendants include the California Department of Corrections and Rehabilitation (CDCR), James Beltz, James Elliot, and six other individuals. Only CDCR, Beltz, and Elliot, however, are respondents in this appeal.

[2] Undesignated statutory references are to the Government Code.

[3] The trial court separately granted summary judgment in favor of the other six defendants, and it granted CDCR summary adjudication in its favor on a second claim under Labor Code section 1102.5, but those rulings are not at issue here.

I.  FACTS

Joseph was fired from his position as a staff dentist at the California Rehabilitation Center (CRC), a CDCR prison, in March 2014.  His dismissal was preceded by a series of lesser adverse actions, including (1) a March 2012 denial of a merit salary adjustment (MSA); (2) a 30-day suspension in November 2012; (3) an April 2013 MSA denial; (4) an October 2013 MSA denial; and (5) a salary reduction (a 5 percent reduction for nine months) imposed in January 2014.[4]  During the relevant time period, Beltz was CRC's supervising dentist and Joseph's direct supervisor, while Elliot was chief executive officer of the medical, dental and mental health departments at CRC.  Beltz is the supervisor who issued the MSA denials; Elliot was responsible for the formal disciplinary actions of suspension, salary reduction, and dismissal.

Joseph contends that his dismissal was retaliation for his oral and written objections to CRC practices that he believed to be violations of a federal court order.[5]  That order, arising out of the settlement of a class action lawsuit regarding CDCR inmate

---

[4]  An April 2013 settlement with CDCR reduced the November 2012 suspension to 20 days.  As part of the settlement, Joseph agreed to release any claims existing as of the time of the agreement against CDCR or its employees.  The March 2012 MSA denial and November 2012 suspension therefore would be barred as independent bases for the whistleblower claim at issue here, though those adverse actions remained part of Joseph's employment history, and thus part of the factual background underlying the termination that Joseph has characterized as his "principal concern" in the present lawsuit.

[5]  Although Joseph's complaint alleges that all of the adverse actions against him were retaliatory, he has focused his appellate arguments on the dismissal.  As noted, however, that dismissal was the last step in a series of progressively more punitive adverse actions, based in part on Joseph's disciplinary history.

3

dental care, is referred to by the parties as the *Perez* order, after the lead plaintiff's name. The *Perez* order, among other things, set timelines for how long, at a maximum, it should take for inmates to receive various types of dental care. Beginning in early 2011, Joseph repeatedly complained to Beltz, Eliot, CDCR managers, the federal judge overseeing implementation of the *Perez* order, and others up to and including "the Governor and Attorney General," that CRC's dental department was improperly circumventing those timelines in various ways.[6]

Defendants, in contrast, contend that the adverse employment actions taken against Joseph were all legitimate and non-retaliatory, triggered by Joseph's repeated refusal to follow various CDCR policies. In a declaration submitted in support of the summary judgment motion at issue here, Beltz stated that his March 2012 decision to deny Joseph a MSA was based on policy violations including, "[a]mong other things," (1) "incidents of Joseph rescheduling inmate dental visits" without notifying or obtaining approval from supervisors; (2) Joseph "fail[ing] to inform his dental clinic that he was unavailable to treat inmates [on a day in March 2012] due to training . . . resulting in

---

[6] Joseph contends the timelines were being circumvented by (1) "simply re-setting the clock" by bringing inmates in for appointments to "simply re-write already-established diagnoses," rather than to provide treatment; and (2) "referring patients to the dental [authorization] review committee (DAR) for referral to outside oral surgeons for conditions that in-house dentists could treat." Both of these practices, according to Joseph, had the effect of removing the patient from the "dental backlog list," even though they remained untreated "for additional and substantial periods of time." Joseph also complained that some medical records were changed to indicate that the inmate-patient was subject to a longer treatment timeline, without any treatment being provided or other documented change in the patient's condition.

4

cancellation of seven inmate dental appointments"; (3) in March 2012, Joseph giving an "incorrect advisement to an inmate that the inmate may not receive dental care if he proceeded with the scheduled examination . . . which misled the inmate, causing him to decline the dental examination"; and (4) Joseph's "consistent failure to comply with instructions from [Beltz and other CDCR managers] to provide mandatory examinations of patient inmates—rather than Joseph's own determination of what dental treatment to provide."[7] In his declaration and in his notice to Joseph, Elliot identified essentially the same factors as underlying his decision to suspend Joseph in November 2012.

Regarding the April 2013 MSA denial, Beltz cited new instances of similar policy violations.[8] The October 2013 MSA denial, however, was based on new and different reasons why Joseph's performance was inadequate. On August 2, 2013, Joseph injected an inmate who was another dentist's patient with a local anesthetic, and he failed to inform the treating dentist or note in the inmate's dental chart that he had done so. After this was discovered, on August 13, 2013, Beltz instructed Joseph to make a "'late entry progress note,'" meaning an entry in the patient's medical records showing both the date treatment had been performed and the actual date the notation in the records was made,

---

[7] The notice issued to Joseph in March 2012 also identifies a "pattern" of often calling in sick or arriving late that was "[c]ontributing" to the "dental department aggregate backlog."

[8] Although not mentioned in Beltz's declaration, the notice to Joseph regarding the April 2013 MSA denial also listed "[w]illful and continuing disregard of instruction to follow chain of command with email correspondence" and unspecified "[u]ncooperative behavior" as unsatisfactory aspects of Joseph's performance.

5

but Joseph instead entered a progress note backdated to the treatment date. Other issues included Joseph's repeated failure to comply with certain other mandatory documentation procedures, as well as his "disregard of a request from another Dentist not to reference that other Dentist in communications with CDCR management."

After the October 2013 MSA denial, Joseph's supervisors again identified problems with Joseph's performance, both new and continuing. In late October 2013, he received an "Employee Counseling Record for writing nonclinical remarks in the Unit Health Record."[9] Joseph also continued to reschedule appointments without notifying managers or obtaining approval. On that basis, along with the previous issues, Elliot imposed the January 2014 salary reduction.[10]

In March 2014, Elliot issued Joseph a third notice of adverse action, informing him that he was "hereby dismissed" from his position. The notice lists three "causes" for the termination, in addition to citing Joseph's disciplinary history: (1) the events of August 2013, relating to Joseph injecting another dentist's patient with local anesthetic

---

[9] The nature of the "nonclinical remarks" is suggested by Elliot's comment in his written notice of the January 2014 salary reduction: "The UHR shall not be used to settle grudges, complain about staff performance, criticize or argue."

[10] Elliot's description in his declaration of which issues were the basis for which adverse action is not entirely consistent with the notices he sent to Joseph. His declaration describes as a basis for the January 2014 salary reduction several instances of poor performance (the unauthorized root canal and documentation problems discussed below) that were first mentioned in the notice of Joseph's March 2014 dismissal. The confusion may arise because those issues occurred in November 2013, before the January 2014 salary reduction, though they apparently only became bases for formal discipline later. Our discussion here is based on the notices.

and then failing to document the treatment in the required manner; (2) on November 19, 2013, performing a root canal on an inmate without obtaining the required prior authorization from the dental authorization review (DAR) committee; and (3) on two occasions in November 2013, failing to properly document a patient's hearing disability, resulting in "the Dental Department's non-compliance" with certain "court-mandated procedures."

In December 2013, Joseph filed a WPA complaint with the State Personnel Board (SPB), alleging that the imposed discipline constituted unlawful retaliation for protected activity. In July 2014, he amended that complaint to add allegations relating to his salary reduction and dismissal. He also appealed his dismissal to the SPB, arguing retaliation among other things. The SPB consolidated the appeal with the WPA complaint.

After a July 2015 evidentiary hearing before an administrative law judge (ALJ), the SPB in October 2015 ruled partially in Joseph's favor, adopting the ALJ's proposed decision. It dismissed some of the alleged violations asserted by CDCR and determined that the dismissal penalty was excessive. It found, however, that Joseph had failed to demonstrate a prima facie case of unlawful retaliation regarding his dismissal, and that his claims relating to prior, lesser disciplinary actions were barred by his failure to timely challenge them through the appropriate administrative processes. It also found that Joseph had engaged in inexcusable neglect of duty (§ 19572, subd. (d)) and willful disobedience (§ 19572, subd. (o)) when in November 2013 he performed a root canal on

7

an inmate, having "intentionally opted" not even to seek the required prior approval of the DAR committee.

More specifically, the ALJ found it unproven that Joseph was incompetent, in violation of section 19572, subdivision (b), noting that "[n]egligence and incompetence are not synonymous." Even though some of Joseph's conduct was negligent, the ALJ found that he was "trained and qualified" for the dental procedures he performed. As to the two inmates in November 2013, the ALJ found Joseph had adequately documented the inmates' hearing impaired status and the means he had used to communicate with them. The ALJ also found that Joseph's late entry to a patient's record about the injection of anesthetic did not constitute falsifying a record; although he backdated the entry to the date of the treatment, he also wrote in "L.E." to "signify its late entry status," and there was no evidence Beltz instructed Joseph to date the entry in a particular way.

The ALJ also found that Joseph injecting another dentist's patient with local anesthetic without informing the dentist, as well as failing to make a contemporaneous note of the treatment in the patient's records, constituted simple negligence, rather than inexcusable neglect of duty. The evidence established that (1) Joseph had tried to relay a message to the other dentist through dental assistants; (2) the other dentist "did not care one way or the other" whether the patient had previously had an anesthesia injection, and "it did not affect his patient care"; (3) although conceivably harm could have come to the patient, it was unlikely under the circumstances because (a) the other dentist did not know how to perform the procedure Joseph performed, which was necessary under the

8

circumstances (the patient could not open his mouth because of a broken jaw), and (b) there was little risk of overdose, given the amount of anesthetic Joseph had used; and (4) for similar reasons, Joseph's failure to document the injection "had almost no substantive impact," and was remedied two weeks later with the late record entry.

The ALJ sustained the charge that Joseph's decision to perform a root canal without obtaining the required permission from the DAR committee constituted inexcusable neglect of duty and willful disobedience. But the ALJ acknowledged that Joseph's conduct was motivated by "consideration for the best interest of his patient," with the "goal . . . to treat the patient and resolve his pain," as well as to provide the patient with dental care required both by the dental standard of care and specific legal mandates to provide "a minimum level of inmate dental treatment." Moreover, the ALJ found that Joseph was correct that if he had sought DAR committee approval for the procedure, it would have been denied, so his actions in fact "benefitted both the patient and [Joseph's] employer." Nevertheless, the ALJ noted that Joseph "could have achieved his goal with greater finesse, i.e., without expressing his dissatisfaction with CRC's practices in a patient Progress Note."

Although the ALJ found in favor of Joseph in some respects, and even expressed understanding regarding the actions that constituted inexcusable neglect and willful disobedience, it expressed concern that if Joseph "ignored his obligation to seek DAR Committee approval in the future, or opted never to seek approval again . . . there could be significant potential for harm to the public service." It concluded that dismissal was

9

not the appropriate penalty, but nevertheless "the penalty imposed must be sufficient to impress on [Joseph] the role of the DAR Committee and the importance of compliance with the DAR Committee approval process." It found that a "90-working day suspension" was the "just and proper" penalty for the sustained charges.

Joseph filed the present lawsuit in June 2016. In October 2019, the trial court granted the summary judgment motion that is at issue in this appeal.

## II. DISCUSSION

Joseph does not dispute that he engaged in the conduct alleged as the basis for his dismissal, or that there is any direct evidence of retaliatory animus by the defendants. Rather, his sole argument in this appeal is that he produced substantial evidence that defendant's stated reasons for his dismissal were pretextual, so there remain triable issues of fact on his WPA claim. We reject the argument.

### A. *Applicable Law*

We independently review an order granting summary judgment (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334), and we "must affirm on any ground supported by the record" (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140). We "must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations] in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) But "[o]nly *admissible evidence* is liberally construed in deciding whether there is a triable issue." (*Bozzi v. Nordstrom, Inc.* (2010)

186 Cal.App.4th 755, 761; see also *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543 ["A party may not raise a *triable* issue of fact at summary judgment by relying on evidence that will not be admissible at trial"].)

The WPA "prohibits retaliation against state employees who 'report waste, fraud, abuse of authority, violation of law, or threat to public health' (§ 8547.1)." (*Miklosy v. Regents of University of Cal.* (2008) 44 Cal.4th 876, 882 (*Miklosy*).) Thus, "section 8547.8, subdivision (c), imposes liability 'in an action for damages' on 'any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee' for disclosing improper governmental activities . . . ." (*Miklosy*, *supra*, 44 Cal.4th at p. 885.)

In *Lawson*, our Supreme Court clarified that "[Labor Code section] 1102.6 provides the governing framework for the presentation and evaluation of whistleblower retaliation claims brought under [Labor Code] section 1102.5." (*Lawson*, *supra*, 12 Cal. 5th at p. 718.) Labor Code section 1102.6 states: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5."

11

This appeal involves Joseph's claim under the WPA, not Labor Code section 1102.5. The WPA, however, includes parallel statutes, setting forth the parties' burdens in terms identical to Labor Code section 1102.6. (See § 8547.8, subd. (e) [applicable to state employees like Joseph]; see also 8547.10, subd. (e) [University of California employees], 8547.12, subd. (e) [California State University employees].) Thus, *Lawson*'s holding applies also to Joseph's WPA claim: first, he has the burden "to establish, by a preponderance of the evidence, that retaliation for [his] protected activities was a contributing factor in a contested employment action." (*Lawson*, *supra*, 12 Cal. 5th at p. 718.) If he makes that showing, "the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had [Joseph] not engaged in protected activity." (*Ibid.*)

B. *Analysis*

Joseph supports his argument that the stated reasons for his termination were pretextual by two pieces of evidence: (1) the ALJ's decision reducing his dismissal to a 90-day suspension and (2) certain deposition testimony by Beltz.[11]

The ALJ's decision does not support an inference that retaliation for Joseph's protected activities was a contributing factor in his dismissal. As noted above, the ALJ

___

[11] The trial court sustained an objection to Beltz's deposition because it was lodged late and relevant pages were not separately submitted and highlighted. It appears, however, that the trial court nevertheless may have considered the testimony, since in its order granting summary judgment it apparently makes reference to facts gleaned from Beltz's testimony.

rejected his WPA complaint on the merits and found that Joseph had engaged in serious misconduct, including inexcusable neglect of duty and willful disobedience, which was appropriately cause for serious discipline, even if not dismissal. It is true that the ALJ found in favor of Joseph in some respects, including by concluding that the evidence did not support all of the asserted bases for firing him. The ALJ also found other aspects of Joseph's conduct constituted simple negligence rather than inexcusable neglect, or were in essence understandable, even if ultimately inexcusable. Nowhere, however, does the ALJ's decision suggest that the adverse actions taken against Joseph were based on anything other than a good faith belief that Joseph had violated various rules and that discipline was therefore appropriate. The ALJ's decision supports the conclusion that the decision to terminate Joseph was "'wrong, mistaken, or unwise.'" (*Morgan v. Regents of the University of Cal.*, *supra*, 88 Cal.App.4th at p. 75.) Nothing in the decision, though, supports an inference that Joseph's protected activity was a contributing factor in his dismissal.

We are also not persuaded by Joseph's several arguments relating to Beltz's deposition testimony. For example, he makes much of Beltz's statements that certain individual actions by Joseph were, to his mind, insufficient to justify dismissal.[12] This

_____

[12] Beltz was asked whether Joseph's failure to leave a "clear note" to another dentist that he had injected that other dentist's patient with local anesthetic while that other dentist was out of the office for lunch would be "sufficient grounds" for termination. Beltz responded: "I don't know. I do not believe so, in and of itself, no." Beltz also agreed that certain other deficiencies in documenting aspects of patient visits were not, in his opinion, grounds for termination, and that coming in late from time to time, as Joseph had, also would not "by itself" be grounds for termination. Beltz also

*[footnote continued on next page]*

line of argument fails for several reasons. First, Beltz was not asked during his deposition about all, or even the most serious of the incidents leading to Joseph's firing. In particular, Beltz was not asked whether intentionally opting not to seek required approval from the DAR committee before performing a root canal on an inmate-patient was, to Beltz's mind, grounds for termination. Second, and more fundamentally, Beltz's concession that any particular incident "in and of itself" or "by itself" was not sufficient to warrant dismissal does not speak to whether he believed Joseph's dismissal was appropriate based on the accumulation of multiple incidents over time. Third, when Beltz *was* asked whether he agreed with the decision to dismiss Joseph, he testified that he "did agree with it." For all of these reasons, it is incorrect for Joseph to assert, as he does in briefing, that "even [Beltz], as a defendant in the case, does not believe in the reasons given for Joseph's dismissal."

Further, it is not reasonable to infer that retaliation was a contributing factor in Joseph's dismissal from the circumstance that Beltz was "caught . . . by surprise" to learn of it. Beltz was not involved in the decision to fire Joseph, so it is unremarkable that he was "surprise[d]" by the news. In context, it is not appropriate to read Beltz's statement as implying that he believed there was no reasonable basis for the termination. To the contrary, Beltz testified that he "could look back on what had transpired and make some sense of it," even though he did not see the dismissal coming.

---

responded "No, it's not," to the question of whether "not having your instruments ready [first thing in the morning, when the dentist is scheduled to start seeing patients] on one occasion" was "grounds for termination."

14

There are also no relevant inferences that are reasonably derived from Beltz's testimony that it has been rare for a dentist to be terminated from CRC employment. Beltz acknowledged that Joseph was the only dentist he knew to have been discharged from CRC since Beltz started there in 1997. To be sure, "[s]howing disparate treatment or policy enforcement is a permissible means to establish pretext." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172.) To show that such a pretext was at work here, however, and that in fact retaliatory motives played at least a contributing factor in his termination, Joseph would have to "identify other similarly situated employees [that his employer] did not terminate." (*Ibid.*) He has not done so; there is no evidence that any other CRC dentists accumulated a comparable history of policy violations but nevertheless were not dismissed.

We also find it irrelevant that Beltz was subjected to formal discipline in a matter relating to Joseph. Beltz explained in his deposition that he had received a reduction in pay because he had failed to "shut . . . down" an argument between Joseph and another dentist during a peer review meeting where the other dentist "got particularly voicy" and Joseph "also got particularly loud." Nothing in evidence, however, provides any non-speculative connection between this incident of Beltz "suffer[ing] a salary reduction for not taking action against Joseph," as Joseph describes it in briefing, and a motive by CDCR or another defendant to retaliate against Joseph for his protected activity.

Finally, Beltz stated in his deposition that sometime in 2010 or 2011, he was instructed by the Regional Dental Director Jeffrey Lissy (also named as a defendant in

15

this case, although not party to this appeal) to perform a "clinical practice analysis" of Joseph: Beltz was "given a list of charts to review that involved treatment that [Joseph] had rendered and diagnoses that [he] had made, and it was [Beltz's] job to critique those." Over a period of about six months, Beltz reviewed about 30 or 35 cases in this way, discussing his conclusions in meetings with Joseph and a health program manager Barry Dixon (another defendant who is not party to this appeal), as well as sending his conclusions to Lissy. Beltz testified that he did not recall performing a similar analysis with respect to any other dentist. Nothing in evidence, however, demonstrates any non-speculative tie between this review of Joseph's work in 2010 or 2011 and any of the adverse actions taken against him beginning in 2012, let alone the 2014 decision by *Elliot* (not Beltz, Dixon, or Lissy) to terminate Joseph. For example, there is no evidence of any similarly situated dentists who were not subjected to such reviews, to support a finding of disparate treatment or policy enforcement. (*Wills v. Superior Court*, *supra*, 195 Cal.App.4th at p. 172.) The mere fact that the review may have come after Joseph began his protected activity is insufficient to allow any reasonable, non-speculative inference of retaliatory motive. (See *Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 357 ["Where the employee relies solely on temporal proximity in response to the employer's evidence of a nonretaliatory reason for termination, he or she does not create a triable issue as to pretext . . ."].)

We conclude that there is no evidence from which a reasonable fact finder could conclude, by a preponderance of the evidence, that retaliation for protected activities was

a contributing factor in the adverse employment actions taken against Joseph.  It follows that the trial court's grant of summary judgment in favor of defendants was correct under the standard articulated in *Lawson*.

### III.  DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____

J.

We concur:

SLOUGH _____

Acting P. J.

MENETREZ _____

J.