Filed 3/18/25  Vallejo v. Union Pacific Railroad Company CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOE J. VALLEJO, SR., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> UNION PACIFIC RAILROAD COMPANY, <br><br> Defendant and Respondent. | D085024 <br><br><br> (Super. Ct. No. CIVSB2134043) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Sachs, Judge.  Affirmed in part, and reversed in part.

Roston Law Group, Matthew E. Roston and Schuyler B. Sorosky for Plaintiff and Appellant.

Constangy, Brooks, Smith & Prophete, Lara C. De Leon, Tazamisha H. Imara and Michael Westheimer for Defendant and Respondent.

Joe J. Vallejo, Sr. appeals from a judgment following an order granting a motion for summary judgment in favor of his former employer, Union Pacific Railroad Company (Union Pacific).  Vallejo contends the superior court erred in concluding as a matter of law that he could not establish any of his claims relating to disability discrimination within the meaning of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et

seq.). We agree with some but not all of Vallejo's contentions. Hence we affirm in part and reverse in part.

## I. BACKGROUND

Vallejo worked for Union Pacific for ten years, primarily as a carman welder. In this position, he worked an 11:00 p.m. to 7:00 a.m. shift, maintaining and repairing rail cars. In performing these functions, he drove about the rail yard using a small all-terrain vehicle known as a gator.

### A. The Events of December 22, 2020 to January 4, 2021

Vallejo was driving a gator toward the end of his shift on December 22, 2020, when it collided with the side of a parked grain car and sustained damage in the form of a detached windshield, a dislodged flood light, and a bent roll bar. Although it had been "wrecked," the gator was nonetheless operable, so Vallejo drove it away from the scene of the collision, parked it, and threw the windshield into the back of the gator. But Vallejo did not report the collision to his employer as required by company policy. Instead, he departed the rail yard following the end of his shift and drove to his home—which is typically a 30-45-minute commute.

Vallejo did not report for his next shift at 11:00 p.m. on December 22. But on the afternoon of December 23, he spoke on the telephone with two Union Pacific supervisors—Paul Friend and Gary Nathaniel—who had reached out to follow-up on suspicions that the damage to the gator had been caused by Vallejo, as well as to inform Vallejo that he was "being pulled out of service pending [an] investigation." During this telephone conversation, Vallejo admitted that he had wrecked the gator and not reported the incident, and he told Nathaniel and Friend that, at the time of the collision, he was thinking that he "might have had COVID" or was "worried about" having COVID.

2

The next day, Union Pacific was informed that Vallejo had been admitted to a hospital the day prior, within hours after the telephone conversation with Nathaniel and Friend. At some point over the course of the next four days, Friend and *his* supervisor—a Union Pacific general director of mechanical maintenance named Byron Hoogland—engaged in a discussion with one another in which they speculated as to why Vallejo had not reported the damage to the gator. In the words of Hoogland: "[I]t seemed like there wasn't any reason he could not have made a notification [¶] because there [are] many different methods of communication. You can radio your manager. You can call your manager. . . . You can talk to your manager face-to-face. There [are] multiple very easy ways to communicate something of that severity and magnitude, especially based on the state of the vehicle [and] where it was left." But Vallejo had not availed himself of any of those methods of communication.

Consequently, Hoogland approved the initiation of an investigation into the collision and the failure to report;[1] and, on December 28, Nathaniel sent a letter to Vallejo furnishing formal notice that the company had launched an investigation and, on January 5, 2021, would be convening a hearing (the disciplinary hearing, or the hearing) under the terms of a union bargaining agreement to ascertain the facts. The letter also said that Vallejo could present witnesses at the hearing and that, if he were found to have violated

---

[1] We intend the phrase "failure to report" to refer to Vallejo's not having proactively reported the collision to Union Pacific. We do not intend it to refer to his not having reported for work the day after the collision.

3

Union Pacific's rule 1.6 pertaining to careless conduct,[2] then his employment might be terminated.

Thereafter, on January 4 (the eve of the disciplinary hearing), Nathaniel received an e-mail from Vallejo's son notifying him that Vallejo's hospitalization had lasted 13 days, informing him that Vallejo had not been discharged until the day prior (January 3), and requesting that the hearing be postponed. Attached to the e-mail were three pages of hospital discharge papers, the substance of which is irrelevant here *except* for a four-line list of medical conditions that appeared with no further explanation under the heading "Your Diagnosis," as follows:

> "Pneumonia due to COVID-19 virus
> "Hypoxia
> "Diabetes mellitus with hyperglycemia

---

[2]     Union Pacific's rule 1.6, entitled "Conduct," states: "Employees must not be:

> "1. Careless of the safety of themselves or others
> "2. Negligent
> "3. Insubordinate
> "4. Dishonest
> "5. Immoral
> "6. Quarrelsome or
> "7. Discourteous

"Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated."

The company defines the term "careless of safety" as "[w]hen an employee's actions or failure to take action demonstrate an inability or an unwillingness to comply with safety rules as evidenced by repeated safety rules infractions or when an employee commits a specific rule infraction that demonstrates a willful, flagrant or reckless disregard for the safety of themselves, other employees or the public." A related policy of the company (rule 3.1) states: "Employees may be removed from service and subject to potential dismissal from employment for a single violation of rule 1.6."

"Hypokalemia"

## B.    The Disciplinary Hearing

The disciplinary hearing was postponed several times at Vallejo's request to afford him an opportunity to recuperate, and was ultimately convened on April 26, 2021, with five individuals in attendance.  Those five persons were:  a Union Pacific senior manager of shop operations named Andreas Mader, who presided at the hearing; Nathaniel, who appeared as the sole witness on behalf of the company; Vallejo, who appeared as the only other witness; and two representatives from Vallejo's union, who examined Vallejo and cross-examined Nathaniel.

In their testimony during the hearing, Nathaniel stated—and Vallejo in essence acknowledged—that it was not until Vallejo had been asked by Nathaniel or Friend during the December 23 telephone conversation, that he admitted to having caused the damage to the gator.

Also in their testimony, each witness touched on the topic of Covid-19 and Vallejo's diagnosis and hospitalization.  But the testimony of neither of them on this topic was particularly illuminating.  To illustrate, Nathaniel testified that, when asked during the December 23 telephone conversation why the collision had occurred, Vallejo responded by saying:  "I was feeling sick and down because I thought I might have COVID and that . . . was on my mind."  Then, when asked (with reference to the discharge papers), "Do you think hypoxia would affect the decision making process?" he responded by saying, "I do not know what hypoxia is" and by suggesting that such a question would be better posed to a medical professional.  Nathaniel also testified that Vallejo had told him on the call that he had tested negative for Covid-19.

Then during *his* testimony, Vallejo testified that the negative test result had occurred *two weeks prior* to the collision on December 22.  When

5

asked why he had not reported the collision, Vallejo said: "I was sick. I was sick and I just can't remember. I just can't remember being able to tell anybody. I was just that sick where I just felt, I have to go home." When asked about the December 23 telephone conversation with Nathaniel and Friend, he said his recollection of the conversation was "really foggy" and "kind of hazy." Implying that the mental fog and haze that he experienced on December 23 had also been present on December 22, he added: "If I [had been] in my right mind, I would have turned . . . in" a report.

When asked whether the hypoxia or pneumonia with which he had been diagnosed "could have possibly obstructed your judgment," Vallejo responded: "Yes." But then, when asked whether he had "any documentation from a doctor . . . stating anything about your COVID, maybe when you got it . . . [or how] extreme it was?" Vallejo responded: "No I don't have any documentation . . . for how serious it was. I mean as far as I know it . . . was a double pneumonia and as far as I know a lack of oxygen. I don't know. I don't know exactly everything."[3]

One of the union representatives offered a closing statement in which he characterized Vallejo's prior safety and attendance record as

---

[3]     After this response, one of the union representatives told Mader he had a doctor's note saying Vallejo "was unable to work prior to this incident." But, when offered an opportunity to provide the note to Mader, the representative declined to do so. Thus the only medical records presented at the disciplinary hearing were the discharge papers.

"impeccable,"[4] and in which he argued that the collision and failure to report had been "an isolated incident" attributable to "the severity of Mr. Vallejo's illness"—which he maintained was "clearly and obviously show[n]" by the diagnoses and duration of Vallejo's hospitalization.

At no point during the disciplinary hearing did either party adduce testimony from a medical professional or proffer any medical records or other form of medical evidence—apart from the discharge papers described above— that might bear (1) on the extent, if any, to which the infirmities that afflicted Vallejo on December 23 might also have afflicted him on December 22, or (2) on how, if at all, those infirmities might have affected Vallejo's cognition and contributed to the collision and failure to report.

## C.     The Termination of Vallejo's Employment

During the two and a half weeks that followed the disciplinary hearing, Hoogland reviewed a transcript of the hearing along with copies of the exhibits admitted in evidence at the hearing. Then, on May 14, 2021, he sent Vallejo a letter. The letter said that "the evidence more than substantially supports the charges" and that the charges were being upheld due to the failure to report, and informed Vallejo that his employment was terminated.

## D.     This Lawsuit and the Motion for Summary Judgment

After his employment had been terminated, Vallejo initiated this lawsuit by filing a complaint asserting violations of the FEHA. Union Pacific

---

[4]     Vallejo argues in similar fashion on appeal that he "did not have 'repeat' violations." But, as he acknowledged in a deposition in this case, he had driven a gator into a rail car in the same rail yard several years prior to 2020 and had been disciplined as a result. Be this as it may, on cross-examination, Nathaniel testified during the disciplinary hearing that Vallejo was "not a repeat offender."

7

answered the complaint and then, 15 months later, filed a motion for summary judgment and summary adjudication.

In opposition to the motion, Vallejo submitted evidence that included: a transcript of the disciplinary hearing; excerpts of deposition testimony from Vallejo, Friend, Nathaniel and Hoogland; 175 pages of medical records (including the three pages of discharge papers); and a declaration from a board-certified specialist in internal medicine and infectious disease—Irving Posalski, MD.

The excerpts from Vallejo's deposition transcript included testimony generally in keeping with his testimony from the disciplinary hearing. It also included testimony to the effect that he had not felt physically or cognitively unwell at the beginning of his shift on December 22, but that, as the shift progressed, his cognitive abilities had deteriorated. Physically, he said, he had felt fine. "It was pretty much . . . [just] up here in my head." But cognitively: "I couldn't . . . think straight"; everything was "just like foggy, blurry, cloudy," "like you're in and out"; and his hearing and sight were "pretty much . . . going in and out." He remembered that two of his colleagues had asked him if something was wrong, and that he had not responded.

Vallejo again acknowledged having "wrecked" the gator, and he added that he had briefly lingered after the end of his shift to speak to the manager on duty, but then, for three reasons, left without speaking to him: (1) he had wanted to avoid being "heckl[ed]" by colleagues with whom the manager was meeting; (2) he "didn't feel good," he "felt sick" and "unsafe," as though he needed to go home rather than waiting for the manager to finish the meeting; and (3) he knew it would be time-consuming to engage in a discussion about

8

the collision, and to prepare the paperwork that that discussion would necessitate.

Vallejo also testified that he didn't remember getting into his truck, arriving home, or anything in between. In addition, he testified that he did not remember much of what had transpired during the December 23 telephone conversation with Nathaniel and Friend, but that he did recall them "pushing" him to quit or retire or resign, and him "begging for [his] job."

The excerpts Vallejo provided from Friend's deposition transcript included an acknowledgement by Friend that Vallejo "was a good worker" and that damaging the gator and not reporting it "would be out of character" for him. The excerpts from Nathaniel's deposition transcript included an acknowledgement by Nathaniel that, at the time of the April 26 disciplinary hearing, he (Nathaniel) thought that "Vallejo was being []honest when he testified that[,] had he been in the right mind, he would have reported the damage to the vehicle." And the excerpts from Hoogland's deposition transcript included acknowledgements: that, had he been provided with input from a medical professional, he would have considered it and "[]likely . . . would [not] have proceeded with the investigation to begin with"; that he could have sought and obtained input from a medical professional on Union Pacific's medical staff, but that he did not do so; and that he would not have upheld the charge had he determined that COVID symptoms played a role in Vallejo's failure to report the collision.

As for the declaration from Dr. Posalski, it said: that "when Mr. Vallejo damaged the cart and did not report the incident on December 22, 2020, [he] had a Covid-19 infection causing mental compromise due to both lack of oxygen and metabolic impairment from diabetes out of control"; "that Mr. Vallejo's mental compromise caused by Covid-19 was at least a substantial

motivating reason as to why Mr. Vallejo damaged the cart and why he did not report the incident on December 22, 2020"; and that "these alleged violations would not have occurred absent Mr. Vallejo's severe Covid complications."

Union Pacific objected to much of the testimony in the declaration of Dr. Posalski on the grounds that it "[l]ack[ed] relevance to the issue[ ] . . . [of] whether Union Pacific *was aware* that Plaintiff was suffering the described 'mental compromise' impacting his conduct when the decision to terminate his employment was made."  But the trial court does not appear to have ruled on this (or any other) objection.  Instead, it granted the motion for summary judgment and entered judgment accordingly.

Vallejo timely appealed.

## II.  DISCUSSION

In addressing the treatment of disabilities in the workplace, the FEHA makes it unlawful for an employer to do any of these three things:

1. "to discharge [an employee] from employment" "because of the[ir] . . . physical . . . [or] mental disability" (Gov. Code § 12940, subd. (a));

2. "to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee" (*id.*, subd. (m)(1)); or

3. "to fail to engage in a timely, good faith, interactive process with [an] employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by [the] employee . . . [when the employee has] a known physical or mental disability."  (*Id.*, subd. (n).)[5]

---

[5]    There are exceptions to these provisions (see, e.g., Gov. Code § 12940, subd. (a)(1), (m)(1), and (n)); however, the exceptions do not appear to be implicated in this case.

10

"In framing and defining [this trio of] . . . concepts—disability discrimination, reasonable accommodation, [and the] interactive process—[the] 'FEHA seeks to assure [that] "those employees with a disability who can perform the essential duties of the employment position with reasonable accommodation" have the opportunity to do so and are not discriminated against based on their disability.' " (*Kaur v. Foster Poultry Farms LLC* (2022) 83 Cal.App.5th 320, 343 (*Kaur*).)

The present case implicates each of these three concepts inasmuch as Vallejo has asserted that Union Pacific terminated his employment because of a disability, that it failed to make a reasonable accommodation, that it failed to engage in the interactive process—and that the superior court erred in determining otherwise. Because the superior court made its determination in the context of a summary judgment motion, we review its ruling de novo. (*Maksimow v. City of South Lake Tahoe* (2024) 106 Cal.App.5th 514, 521.) So doing, we accept as true admissible evidence presented by Union Pacific that is uncontradicted by Vallejo. (See *Kaur, supra,* 83 Cal.App.5th at p. 336.) We also accept as true admissible evidence presented by Vallejo, along with reasonable inferences that can be drawn therefrom; and we liberally construe such evidence in support of Vallejo, resolving any evidentiary doubts in his favor. (*Ibid.*)

Turning then to the particulars of the claims being asserted in this case, we begin with the claim that Union Pacific terminated Vallejo's employment because of a disability.

## A.     The Disability Discrimination Claim

As discussed *ante*, it is unlawful to terminate an employee's employment "because of" his physical or mental disability. (Gov. Code § 12940, subd. (a).) To establish a prima facie case of discrimination of this sort, a plaintiff must establish that he "(1) suffered from a disability, (2) could

11

perform the essential duties of [the] job with or without reasonable accommodation, and (3) was subjected to an adverse employment action *because of* the disability or perceived disability." (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 37–38 (*Zamora*).)

In the present case, neither of the first two elements is in dispute. Union Pacific has conceded for purposes of its motion "that COVID is a disabling condition within the meaning of the Fair Employment and Housing Act." It also has conceded that Vallejo was diagnosed with Covid-19 on December 23. And it does not claim that Vallejo lacked the experience or skills necessary to perform in the position of carman welder.[6] Thus, where the battle is joined is at element number three. That is, the element that requires the finder of fact to decide whether the termination of Vallejo's employment may properly be said to have been "because of"—i.e., motivated by—discriminatory intent.

In considering the topic of discriminatory intent, courts are guided by the principle that the FEHA is intended to protect against discrimination, and nothing else. " '[The Act] does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "[The FEHA] addresses discrimination." "[It] is not a shield against harsh treatment at the workplace." . . . Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory

---

[6] No party has expressed a belief that the disabling condition that Vallejo experienced during parts of December and January was anything other than transitory; nor has any party expressed an expectation that the condition is likely to recur.

12

reason.' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 (*Arteaga*).)

Courts also are guided by the principle that: "An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 237 (*Brundage*).) Thus, in order to prove a FEHA employment discrimination claim, a plaintiff must establish that his employer was aware of his disability when the adverse employment decision was made. (*Brundage,* at pp. 235, 237.)

### 1.   *The Two Methods for Establishing Discriminatory Intent*

To establish that an employer's adverse action toward an employee was motivated by discriminatory intent, the employee may present either of two types of evidence—circumstantial or direct. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 549 (*DeJung*).)

### a.   Circumstantial Evidence and the *McDonnell Douglas* Burden-Shifting Test

When plaintiffs present *circumstantial* evidence to prove their FEHA discrimination claims, courts apply a three-stage burden-shifting test that the United States Supreme Court established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) for the purpose of resolving employment discrimination claims premised on theories of disparate treatment.[7] (*Zamora, supra,* 71 Cal.App.5th at p. 31; *DeJung, supra,* 169 Cal.App.4th at p. 549.) "This test 'reflects the principle that *direct evidence* of intentional discrimination is rare, and that . . . claims [of intentional discrimination] must usually be proved circumstantially. Thus,

---

[7]    " 'Disparate treatment' is intentional discrimination on prohibited grounds." (*DeJung, supra,* 169 Cal.App.4th at p. 549, fn. 10.)

by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' " (*Zamora,* at p. 31.)

"Under the first step of the *McDonnell Douglas* test, the plaintiff may raise a presumption of discrimination by presenting a ' "prima facie case." ' " (*Zamora, supra,* 71 Cal.App.5th at p. 31.) (The elements of a prima facie disparate treatment disability discrimination claim are set forth above.) " 'A satisfactory showing . . . gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff.' " (*Ibid*.)

"Under the second step of the *McDonnel Douglas* test, 'the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. [Citation.] At that point the presumption disappears.' " (*Zamora, supra,* 71 Cal.App.5th at p. 32.)

"Under the third step of the test, the 'plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Zamora, supra,* 71 Cal.App.5th at p. 32; see also *DeJung, supra,* 169 Cal.App.4th at p. 553 [" ' "The plaintiff may establish pretext . . . by showing that the employer's proffered explanation is not worthy of credence." ' "].) But "[i]n demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, ' "[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." ' " (*Zamora,* at p. 32.)

### b. Direct Evidence and the Alternative Test

Although the *McDonnell Douglas* test is the framework that courts use for analyzing most FEHA employment discrimination claims, it is not the

only such framework.  This is because "California has also adopted the rule that ' "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." ' " (*DeJung, supra,* 169 Cal.App.4th at p. 550; see also *Zamora, supra,* 71 Cal.App.5th at p. 34 ["Courts have held that the three-stage *McDonnell Douglas* framework does not apply when the employee presents *direct evidence* of discrimination"]; *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 123 (*Wallace*) ["The three-stage framework . . . do[es] not apply in discrimination cases where . . . the plaintiff presents direct evidence of the employer's motivation for the adverse employment action" (fn. omitted)].)

The rationale for this departure from the *McDonnell Douglas* framework in favor of a more streamlined approach in instances involving direct evidence of employment discrimination is that " '[t]he shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence." ' " (*DeJung, supra,* 169 Cal.App.4th at p. 550, italics omitted.) "Thus, there is no need to engage in this burden-shifting analysis where there is direct evidence of discriminatory animus." (*Ibid.*)

Among the various different types of employment discrimination claims, *disability* claims are unique in that they "often involve direct evidence of the role of the employee's actual or perceived disability in the employer's decision to implement an adverse employment action." (*Wallace, supra,* 245 Cal.App.4th at p. 123.)  For this reason, "courts and practitioners should not automatically apply principles related to the *McDonnell Douglas* test to disability discrimination cases.  Rather, they should . . . determine whether there is direct evidence that the motive for the employer's conduct was related to the employee's physical or mental condition." (*Ibid.*)

15

In cases in which there is such direct evidence, and in which (as here) the employee's ability to safely perform the essential duties of the job is not in dispute, a plaintiff can bypass the *McDonnell Douglas* burden-shifting test and "can establish the requisite employer intent to discriminate by proving"—with direct evidence—"(1) [that] the employer knew [the] plaintiff had a physical [or mental] condition that limited a major life activity,[8] or perceived him to have such a condition, and (2) [that this] actual or perceived physical condition was a substantial motivating reason for the defendant's decision to subject the plaintiff to an adverse employment action." (*Wallace, supra,* 245 Cal.App.4th at p. 129.)

2. *Analysis*

   a. **Direct Evidence of Discriminatory Intent**

Vallejo contends—and Union Pacific disputes—that the court below was presented with direct evidence of discriminatory intent and, as a consequence, that the alternative test (rather than the *McDonnell Douglas* burden-shifting test) should apply. In support of this contention Vallejo cites evidence that, by the time it decided to terminate his employment, Union Pacific had been made aware of his diagnoses and had learned—from his December 23 remarks to Nathaniel and Friend, and from his testimony at the disciplinary hearing—that, at the time of the collision, he had not been "in [his] right mind." In addition, Vallejo cites his hearing testimony to the effect

---

8    The reference to a major life activity derives from the FEHA's definition of the term physical disability, which includes any physiological disease or condition that (1) "[a]ffects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic  and lymphatic, skin, and endocrine"; and (2) "[l]imits a major life activity."  (Gov. Code § 12926, subd. (m)(1)(A)&)B).)

16

that "he would have reported the accident had he been in the right state of mind." He says that, at the hearing, he "discussed at length" the "mental symptoms that he suffered on the day of the incident." And he points out that one of his union representatives "argued during the hearing that [his] state of mind resulting from his Covid-19 complications affected his decision-making processes on the day of the accident, including his failure to report the same."

But—to the extent this rendition is correct,[9] to the extent it is rooted in evidence instead of argument, and to the extent it is being used to demonstrate that Union Pacific was aware on May 14 that Vallejo had been experiencing a disabling condition on the morning of December 22—the evidence proffered is circumstantial, not direct.[10] (See *Zamora, supra,* 71 Cal.App.5th at p. 35 ["Direct evidence is evidence that proves a fact without inference or presumption"]; *DeJung, supra,* 169 Cal.App.4th at p. 550

_____

[9] Vallejo's assertion that, during the disciplinary hearing, he discussed the symptoms he experienced on December 22 "at length" is somewhat of a stretch.

[10] Examples of truly "[d]irect evidence include[s] comments that demonstrate discriminatory animus and a causal relationship between those comments and the adverse employment action." (*Zamora, supra,* 71 Cal.App.5th at p. 35; see, e.g., *DeJung, supra,* 169 Cal.App.4th at pp. 540–541, 550 [chairman of hiring committee told employee seeking promotion that "we're looking for someone younger," "maybe in their 40's"].) They also include outright admissions that an adverse employment action was premised on a belief that the employee was disabled. (See, e.g., *Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, 50–53 [employer admitted it terminated employee based on its belief that employee was totally disabled and unable to work]; *Wallace, supra,* 245 Cal.App.4th at pp. 123, 132–133 [employer admitted it imposed unpaid leave of absence on employee based on its belief that restrictions necessitated by employee's physical disability rendered him unable to safely perform his duties].)

17

["Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption"].)

Marshaling the information furnished to Union Pacific prior to Vallejo's termination (together with matters that Union Pacific does not dispute), there certainly is direct evidence that the company knew: (1) that Vallejo had been hospitalized for nearly two weeks commencing late in the day on December 23; (2) that, at some point during his hospitalization, he had been diagnosed with serious conditions; (3) that he claimed to have been cognitively impaired early in the day on December 22; and (4) that he attributed the collision and the failure to report to the cognitive impairment, and the cognitive impairment to the serious conditions. This might qualify as direct evidence of pre-termination knowledge on the part of Union Pacific that Vallejo suffered from a disabling condition for a period of time beginning at some point on or after December 23. (Cf. *Humphrey v. Memorial Hospitals Assn.* (9th Cir. 2001) 239 F.3d 1128 [conduct resulting from a disability is indistinguishable from the disability itself].) But it requires an inference (actually several inferences) to deduce from this evidence that Union Pacific knew, pre-termination, that Vallejo had been disabled within the meaning of the FEHA as early as the morning of December 22, and that the collision and failure to report that morning were attributable to a disability rather than to Vallejo having been careless, irresponsible or reluctant to report what he had

18

done.[11] (Cf. *Avila, supra,* 165 Cal.App.4th at p. 1248 [" 'While knowledge of the disability can be inferred from the circumstances, [such] knowledge will only be imputed to the employer when the fact of disability is the *only* reasonable interpretation of the known facts,' " italics added]; *Brundage, supra,* 57 Cal.App.4th at p. 237 [same]; *Arteaga, supra,* 163 Cal.App.4th at

---

[11] The Posalski declaration certainly supports the position that Vallejo was disabled on the morning of December 22. But it is not probative as to Union Pacific's knowledge. (See *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1251 (*Avila*) ["Evidence that a decision maker learned of a plaintiff's disability *after* deciding to take adverse employment action is not probative of whether the decision maker was aware of the plaintiff's disability when he or she made the decision" and thus "is irrelevant to determining whether the decision maker acted from a discriminatory animus"]; *Brundage, supra*, 57 Cal.App.4th at pp. 236–237 [same].)

19

p. 347 ["An employer does not have to accept an employee's subjective belief that he is disabled"[12]].)

Thus the only available way for Vallejo to establish discriminatory intent is through circumstantial evidence.

---

[12] Notably, *Arteaga* says that, rather than "accept an employee's subjective belief that he is disabled," an employer "may rely on medical information" instead. (*Arteaga, supra,* 163 Cal.App.4th at p. 347.) Channeling this concept, Vallejo faults Union Pacific for completing its inquiry into his conduct "without [having] conduct[ed] any sort of independent medical consultation" and without having "conduct[ed] any investigation . . . as to whether [Vallejo's] Covid-19 diagnosis and related complications influenced the accident or [Vallejo's] failure to report." (Union Pacific argues the mirror image—i.e., that, before his employment was terminated, Vallejo "provided no information from his doctor concerning his condition at the time of the accident.")

But Vallejo supplies no authority for the proposition that Union Pacific was *obligated* to undertake such a consultation. Notably in this regard, regulations pertaining to the interactive process and requests for accommodations *permit* an employer to undertake a medical consultation or demand documentation in certain circumstances (see, e.g., Cal. Code Regs., tit. 2, § 11069, subd. (c)(6) ["[w]hen needed to assess a requested accommodation or to advance the interactive process, the employer or other covered entity *may* consult experts"; italics added; *id.,* subd. (c)(2) ["[w]hen the disability or need for reasonable accommodation is not obvious, and the . . . employee has not already provided the employer . . . with reasonable medical documentation confirming the existence of the disability and the need for reasonable accommodation, the employer *may* require the . . . employee to provide . . . reasonable medical documentation."].) But nothing in the parties' briefs has led us to any authority recognizing a right in, or imposing an (inquiry-notice-like) duty on, an employer to consult experts or require documentation in the context of deciding whether to terminate an employee's employment. Nor has our own research uncovered the existence of any such right or obligation.

20

### b. Circumstantial Evidence of Discriminatory Intent

Turning to circumstantial evidence and the *McDonnell Douglas* burden-shifting test, we begin with step one—which (as noted above) required Vallejo to establish a prima facie case by showing: "that he: (1) suffered from a disability, (2) could perform the essential duties of [his] job with or without reasonable accommodation, and (3) was subjected to an adverse employment action *because of* the disability or perceived disability." (*Zamora, supra,* 71 Cal.App.5th at pp. 37–38.) "To establish a prima facie case, the employee must show ' " ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion.' " ' " ' " (*Zamora,* at p. 38.) "The employee's burden of proving a prima facie case is not onerous, and very little evidence is required at this step." (*Ibid*.) Considering the inferences that may be drawn from the evidence presented we conclude this burden is met inasmuch as elements one and two are not in dispute and, as to element three, a jury could conclude that Union Pacific knew on May 14 that the December 22 collision and failure to report were attributable, not to carelessness and a reluctance to report, but rather to a cognitive impairment rooted in the same disability from which (the company concedes) Vallejo suffered *after* December 22.

Vallejo having carried his burden at step one of the *McDonnell Douglas* test, a presumption of discrimination has arisen, and "the burden shifts to [Union Pacific at stage two] to rebut the presumption by producing admissible evidence, sufficient to raise a genuine issue of fact and to justify a judgment for [it], that its action was taken for a legitimate, nondiscriminatory reason." Considering the evidence presented, and the inferences that may be drawn therefrom, we conclude that this burden, too, is met. A jury could conclude that Union Pacific terminated Vallejo's

employment, not because it knew that he suffered from a disability on December 22, but rather because it believed he had *not* suffered from a disability on that date and believed instead that his cognitive faculties had been intact and that he had been careless and reluctant to report.

Thus we arrive at step three of the *McDonnell Douglas* test, where the burden shifts back to Vallejo to demonstrate a triable issue of fact by producing substantial evidence that Union Pacific's stated reasons for terminating his employment were pretextual or to offer any other evidence of a discriminatory motive. The evidence in this regard is not overwhelming. But nor is it so slight as to lack probative value or preclude a jury from finding the requisite intent. Indeed, on the basis of the evidence and undisputed facts set forth above, a jury could find: (1) that the collision was not a grave offense; (2) that it and the failure to report were attributable, not to carelessness or irresponsibility, but to the sudden and unforeseeable onset of a substantial cognitive impairment, the reality and severity of which were substantiated by the diagnoses, the duration of the hospitalization and convalescence, and the hospitalization's proximity in time to the collision and failure to report; (3) that, in light of the supervisors' deposition testimony that Vallejo "was a good worker," that damaging the gator and not reporting it "would be out of character" for him, and that his protestations that he "would have reported the damage" "had he been in the right mind" were believable, the company should have consulted its own medical staff, should not been so quick to initiate disciplinary charges, and should have refrained from imposing the harshest penalty (termination) that was available; (4) that, in the face of such circumstances, it was callous, precipitous, excessive,

and a violation of company policy[13] for Union Pacific to proceed as it did; and (5) that such circumstances reveal a discriminatory motive.[14] The existence of potential inferences and findings such as these reveals a triable issue of fact as to whether something more than just a concern for safety and compliance played a substantial role in the termination—that is, as to whether Union Pacific was motivated by discriminatory intent.

---

[13] In a Frequently Asked Questions portion of a document pertaining to its workplace policies, Union Pacific poses the question: "Can an employee be dismissed for a single rule or policy violation?" It then answers the question as follows: "Yes. An incident can be so egregious or have such serious consequences that the employee can be removed from service and charged with a safety, conduct rule and/or policy violation." Vallejo argues that the collision and failure to report were not sufficiently egregious, and did not have consequences sufficiently serious, to trigger termination of his employment.

[14] In arriving at our conclusion that circumstantial evidence could support a finding that the decision to terminate Vallejo's employment was motivated by discriminatory intent, we have disregarded certain evidence and arguments that Vallejo has urged us to consider. Thus, for example, we have disregarded declarations from Vallejo's daughter and a colleague, and references thereto, because neither of these declarations is sworn; and we have disregarded references to a declaration from Vallejo's wife because that declaration does not appear in the record. We also have disregarded arguments in which Vallejo cites two of those three declarations for the proposition that, during the December 23 telephone call, Nathaniel and Friend browbeat and "threatened to fire" Vallejo "as he was struggling to breathe over the phone." In addition, we reject Vallejo's argument that discriminatory intent is revealed in Union Pacific interrogatory responses admitting (in the words of Vallejo's counsel) that "four out of six employees charged with rule 1.6 violations within five years of [Vallejo]'s termination received discipline less than termination." We cannot agree with his assertion that it is appropriate to "assume that the conduct of the non-terminated employees may have been far more egregious than [Vallejo]'s disability-induced minor accident."

## B.    The Reasonable Accommodation and Interactive Process Claims

As discussed *ante*, in addition to claiming that Union Pacific violated the FEHA by engaging in disability discrimination, Vallejo also claims it violated the Act by denying him a reasonable accommodation and by failing to engage in the interactive process.

Vallejo's reasonable accommodation claim is premised in essence on the fact that Union Pacific did not accord him grace, by excusing the collision and failure to report, in light of the attendant circumstances.[15] But a retrospective accommodation is not a reasonable accommodation within the meaning of the FEHA. (See Equal Employment Opportunity Commission publication entitled *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, available at 2002 WL 31994335, at \*25 (EEOC Enforcement Guidance) ["Since [a] reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability"]; cf. *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 723 [citing and relying on EEOC Enforcement Guidance; stating that the "EEOC's 'definition of "reasonable accommodation" appropriately guides our construction of [the FEHA] because 'the California Legislature has modeled the reasonable accommodation requirements of [Government Code] section 12940(m) and section 12940(n) on the parallel federal requirements.' "].)

As for the interactive process claim, it fails for the same reason that the reasonable accommodation claim fails. "[I]n order to succeed on a cause of

_____

15    As part of its response to this claim, Union Pacific argues it reasonably accommodated Vallejo's disability by postponing the disciplinary hearing and by granting each request for leave he submitted during his recuperation.

action for failure to engage in an interactive process, 'an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred.' " (*Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 96; cf. *Alamillo v. BNSF Railway Co.* (9th Cir. 2017) 869 F.3d 916, 923 ["FEHA does not impose liability for failure to engage in the interactive process when no reasonable accommodation is possible"]; accord *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 979.) Inasmuch as the accommodation for which Vallejo contends is one that was unavailable, there was no interactive process in which to engage—and thus no reasonable jury could find in Vallejo's favor on the reasonable accommodation or interactive process claims.

## III. DISPOSITION

The judgment is reversed as to the claim of disability discrimination, and is affirmed in all other respects. Vallejo is entitled to costs on appeal.

KELETY, J.

WE CONCUR:


DO, Acting P. J.


CASTILLO, J.

25